1

2

3

4                    UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7    CORY A. HORTON,                    Case No.  22-cv-03174-WHO

8                Plaintiff,

9          v.                          **ORDER GRANTING IN PART AND
                                       DENYING IN PART MOTIONS TO
10   DENA NARBAITZ, et al.,             DISMISS**

11               Defendants.            Re: Dkt. Nos. 45, 48, 49

12

13        Cory Horton, who is representing himself, brings 29 claims against his former employer,

14   the City and County of San Francisco and San Francisco Public Utilities Commission

15   (collectively, "the City"), and current and former SFPUC employees Rachel Gardunio, Dennis

16   Herrera, Maria Mabutas, Rick Nelson, and Deena Narbaitz (collectively, "the individual

17   defendants").  The crux of these claims is that after Horton was assaulted near his job site, causing

18   him severe trauma, the defendants discriminated against him based on his disability and race,

19   failed to accommodate his disability, and ultimately fired him by way of medical separation.

20        The defendants have moved to dismiss.  Most of Horton's claims against the individual

21   defendants cannot proceed: his Title VII, Americans with Disabilities Act ("ADA"), and the

22   majority of his California Government Code claims are DISMISSED with prejudice, either

23   because these statutes do not provide a cause of action against individuals, or because Horton did

24   not intend to assert these claims against the individual defendants, or both.  And the Unruh Act,

25   Occupational Safety and Health Act ("OSHA"), and constructive discharge claims are

26   DISMISSED with prejudice against all defendants because they do not apply to the facts alleged.

27        That said, given my duty to liberally construe Horton's complaint, most of the claims

28   asserted against the City in the Second Amended Complaint ("SAC") survive.  He plausibly states

United States District Court
Northern District of California

United States District Court
Northern District of California

claims for hostile work environment under Title VII; discrimination and failure to accommodate in violation of the ADA; and failure to accommodate, engage in good faith in the interactive process, and prevent discrimination and harassment under California's Fair Employment and Housing Act ("FEHA"). And for now, most of Horton's Labor Code claims (except for Claim 22) may proceed as well against all defendants because the statutory language and case law undercut the defendants' sole argument that the relevant laws do not provide a private right of action.

Meanwhile, I have referred Horton to the Federal Pro Bono Project for appointment of counsel and stayed all proceedings until four weeks from the date an attorney is appointed.

## BACKGROUND

Horton became employed as a stationary engineer with SFPUC as a temporary employee in November 2019, and moved to a permanent position one year later. SAC [Dkt. No. 38] ¶ 10.[1] He worked at the SFPUC's headquarters near San Francisco's Tenderloin neighborhood, where his job responsibilities included "supervising subordinate staff; building operation, maintenance, and repair of pumping, ventilating, and heating equipment"; inspecting the building daily; and operating and maintaining machines and equipment. *See id.* ¶¶ 6-7.

On the morning of August 12, 2020, Horton was assaulted by three men with a knife in the Tenderloin district, "within a few minutes" from his job site. *Id.* ¶ 13. Horton reported this incident to his supervisor and a safety officer the same day. *See id.* ¶¶ 25-26.

On August 17, 2020, Horton emailed one of the defendants, Mabutas, indicating that he was concerned about his safety and well-being and needed an accommodation. *Id.* ¶ 16. He verbally asked Mabutas and his direct supervisor (who is not named as a defendant) for modifications to his schedule and "assistance with ensuring job safety." *Id.* ¶ 18. Horton alleges that his "employer" (although he does not specify who) asked if he would consider driving to

---

[1] Horton filed his SAC on December 5, 2022, within 30 days of the issuance of my Order granting the defendants' motion to dismiss his First Amended Complaint ("FAC"). *See* Dkt. Nos. 36, 38. Nearly a month later, on January 2, 2022, he filed an "amended document," that appears to be an identical SAC and attached exhibits, but adds three new exhibits: Exhibits S, T, and U. *See* Dkt. No. 39. Because the SACs in both filings are substantively identical, because Exhibits S, T, and U did not factor into my consideration of the plausibility of Horton's claims, and because the initial SAC was filed within the 30-day timeframe I provided, I will treat the complaint filed at Docket Number 38 as the operative pleading.

work and offered him a parking pass. *Id.* ¶ 19.  Horton agreed, but told his employer that driving

his own vehicle to work "would create an enormous expense . . . equating to a specific pay cut."

*Id.*  Horton alleges that although his employer agreed to give him a parking pass, he did not get

one. *Id.* ¶ 21.  Instead, he alleges, the four available parking passes went to coworkers who did

not have a disability, were not victims of an assault, and had not requested an accommodation. *Id.*

Horton returned to work on August 18, 2020. *Id.* ¶ 27.  While performing his outside

rounds, one of his attackers encountered him "in a disruptive threatening manner." *Id.*  Horton

alleges that "events of stalking, threats, intimidating, [and] harassment" by people he did not know

continued as he performed his outside rounds from September through December 2020. *Id.*  He

further alleges that he was called the N-word at least once and also threatened by someone who

said, "Murder the monkey." *Id.* ¶¶ 28-29.

Although Horton filed complaints, the SAC alleges that "[n]othing was done by SFPUC

management regarding implementing a safety plan" or improve safety. *See id.* ¶¶ 28, 30, 33.

Fearing for his life, Horton began carrying weapons to work. *Id.* ¶ 31.  He also experienced

blackouts, anxiety and panic attacks, and "issues interacting with others." *Id.* ¶ 32.

In December 2020, Horton took "non-related family medical leave." *Id.* ¶ 35.  According

to the SAC, his "fears of discharging a weapon became more viable due to the increased incidents

of harassment, intimidation, threats, [and] disruptive behavior." *Id.*  In February 2021, Horton

began trauma therapy. *Id.* ¶ 37.  His medical provider soon placed him out of work "due to

impairment related to [his] disability." *Id.*  Horton then made a second request for an

accommodation, this time with defendant Nelson, asking for a change of duty or remote work. *Id.*

Horton alleges that the subsequent accommodations process with Nelson and defendant

Narbaitz was "very disruptive, non-interactive, abusive, and combative." *Id.* ¶ 45.  The SAC

alleges that Horton's requests for remote work, "job restructuring," safe access to the building, and

the ability to transfer jobs were denied, and that these defendants "insisted that leave would be the

only option." *See id.* ¶¶ 46, 51.

On November 30, 2021, Horton was medically separated from SFPUC for his inability to

return to work. *Id.* ¶ 59.  According to Horton, his condition was never deemed indefinite, his

1    doctor did not indicate that he would never be able to return to work, and his goal was to remain

2    employed with SFPUC.  *See id*. ¶ 60.

3        I dismissed Horton's FAC for failure to plausibly state a claim for relief, but granted leave

4    to amend.  Order Granting Mot. to Dismiss ("First MTD Order") [Dkt. No. 36] 2:3-6.  The SAC

5    asserts 29 claims, including violations of Title VII, the ADA, and the California Labor Code,

6    among others.  *See generally* SAC.  The defendants have filed three pending motions to dismiss.

7    Dkt. Nos. 45, 48, 49.[2]

8                               **LEGAL STANDARD**

9        Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint

10   if it fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion, the

11   plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl.*

12   *Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the plaintiff

13   pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for

14   the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  This

15   standard is not akin to a probability requirement, but there must be "more than a sheer possibility

16   that a defendant has acted unlawfully." *Id*.  While courts do not require "heightened fact pleading

17   of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative

18   level." *Twombly*, 550 U.S. at 555, 570.

19       In deciding whether the plaintiff has stated a claim upon which relief can be granted, the

20   court accepts his allegations as true and draws all reasonable inferences in his favor.  *Usher v. City*

21   *of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  However, the court is not required to accept as

22   true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable

23   inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

24       Pro se complaints are held to "less stringent standards than formal pleadings drafted by

25

26   ───────────────────

27   [2] A fourth set of defendants (Hallie Albert, Jennifer Burke, Michael Carlin, Brian Cauley, David Chiu, Ronald Flynn, Barbara Hale, Carol Isen, Alan Johanson, Wendy Macy, Greg Norby, Carmen Pearson, Steve Ritchie, and Steven Tang) also filed a motion to dismiss.  *See* Dkt. No. 47.

28   Before that motion was fully briefed, Horton filed a notice of voluntary dismissal against those defendants, rendering their motion moot.  Dkt. Nos. 56, 57.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   lawyers." *Haines v. Kerner*, 404 U.S. 519, 520 (1972). Where a plaintiff is proceeding pro se, the

2   court has an obligation to construe the pleadings liberally and to afford the plaintiff the benefit of

3   any doubt. *Bretz v. Kelman*, 773 F.2d 1026, 1027 n.1 (9th Cir. 1985) (en banc). However, pro se

4   pleadings must still allege facts sufficient to allow a reviewing court to determine whether a claim

5   has been stated. *Ivey v. Bd. of Regents of Univ. of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982).

6       If the court dismisses the complaint, it "should grant leave to amend even if no request to

7   amend the pleading was made, unless it determines that the pleading could not possibly be cured

8   by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). In making

9   this determination, the court should consider factors such as "the presence or absence of undue

10  delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments,

11  undue prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kayport*

12  *Package Express*, 885 F.2d 531, 538 (9th Cir.1989).

13                                     **DISCUSSION**

14      Given the overlapping arguments made in the three motions to dismiss and Horton's

15  responses, and in the interest of clarity, I will analyze the sufficiency of each claim rather than

16  embark on an individual analysis of each motion.

17  **I.      CLAIMS AGAINST INDIVIDUAL DEFENDANTS**

18      At the outset, several claims can be dismissed against the individual defendants because

19  the relevant statutes do not provide a cause of action against them, because Horton clarifies that he

20  did not intend to assert these claims against the individual defendants, or both. This includes

21  Horton's Title VII and ADA claims. *See Holly D. v. Cal. Inst. of Tech.*, 339 F.3d 1158, 1179 (9th

22  Cir. 2003) ("Title VII does not provide a cause of action for damages against supervisors or fellow

23  employees.") (citing cases); *Walsh v. Nevada Dep't of Hum. Res.*, 471 F.3d 1033, 1038 (9th Cir.

24  2006) ("individual defendants cannot be held personally liable for violations of the ADA");

25  *Juricich v. Cnty. of San Mateo*, No. 19-CV-06413-WHO, 2020 WL 619840, at *6 (N.D. Cal. Feb.

26  10, 2020) ("the ADA does not provide a cause of action against individual defendants in their

27  individual capacities").

28      Horton does not challenge the individual defendants' contention that these claims cannot

be brought against them.  Instead, he states that he intended to assert these claims only against the City and that any allegations about the individual defendants were intended to show the City's liability.  *See* Second Oppo. [Dkt. No. 53] 6:17-19 (stating that the "facts and exhibits in the amended complaint" related to the Title VII claims "were intended to be alleged against the employer SFPUC and the City and County of San Francisco and not the individuals"); 8:24-26 (stating the same about the ADA claims); Third Oppo. [Dkt. No. 54] 5:13 (describing the "defendant's wrongful assumption that [Title VII] claims are against individuals"); 5 (stating the same about the ADA claims). [3]

Horton also clarifies in his opposition that he intended to allege the majority of his claims under the California Government Code against the City, rather than the individual defendants. *See, e.g.*, Second Oppo. at 10:7-8 (Claim 12 was "intended to be alleged against the employer SFPUC and the City & County of San Francisco and not the individuals."); 12:27-13:1 ("At no point throughout claims 16 and 17 are any claims alleged [against] individuals.  However the defendants have misconstrued this reality to convey accusations against individuals when in fact they are against employers."), 13:26-14:3 (Claim 18 "does not allege liability to any individual but to the employer SFPUC and City & County of San Francisco"), 14:19-21 (Claim 19 "plead[s] that the employer not individuals are liable for retaliation"), 16:1-11 (Claim 20 "[s]hows to the courts on which grounds employers SFPUC, City & County of San Francisco are liable" and added the City defendants "to help resolve any issues of confusing individual liability"), 17:8-10 (Claim 21 "clearly show[s] no indication of allegations towards individuals, however the defense has continued to imply so . . . [t]he original intent was only to show plausibility and what these individuals did via their unlawful actions under the umbrella of the employer.").

Accordingly, Claims 1-9, 12, and 16-21 are DISMISSED against the individual defendants with prejudice.

## II.   TITLE VII CLAIMS AGAINST THE CITY

---

[3] Horton filed three oppositions to the three motions to dismiss that make overlapping arguments. *See* Dkt. Nos. 50, 53, 54.  "First Oppo." refers to his opposition to the City's motion.  Dkt. No. 50. "Second Oppo." refers to his opposition to the motion from Gardunio, Herrera, Mabutas, and Nelson.  Dkt. No. 53.  "Third Oppo." refers to his opposition to Narbaitz's motion.  Dkt. No. 54.

United States District Court
Northern District of California

Title VII of the Civil Rights Act of 1964 prohibits employers from, in part, discharging or otherwise discriminating against any person "with respect to his compensation, terms, conditions, or privileges of employment" because of his race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-2(a)(1).  Claims 1, 2, and 3 allege violations of Title VII: hostile work environment on the basis of race, retaliation, and constructive discharge.  SAC ¶¶ 62-75.

### a.   Hostile Work Environment (Claim 1)

To plead a hostile work environment claim under Title VII, a plaintiff must show: (1) he was "subjected to verbal or physical conduct" because of his race; (2) "the conduct was unwelcome"; and (3) "the conduct was sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive work environment." *Manatt v. Bank of Am., NA*, 339 F.3d 792, 798 (9th Cir. 2003) (citation omitted).  The City argues that Horton's hostile work environment claim fails because "an employer generally cannot be held liable for racial harassment based on the conduct of third parties, especially when the conduct was committed outside of the workplace."  City Mot. to Dismiss ("City MTD") [Dkt. No. 45] 15:2-4.

But the City overlooks Ninth Circuit precedent that states the opposite.  In *Galdamez v. Potter*, 415 F.3d 1015, 1022 (9th Cir. 2005), for example, the court held that "[a]n employer may be held liable for the actionable third-party harassment of its employees where it ratifies or condones the conduct by failing to investigate and remedy it after learning of it."  In a footnote, the court confirmed that this applied not only to cases alleging hostile work environments created by third-party sexual harassment, but also "instances of racial or national origin harassment." *See id.* at 1022 n.5 (citations omitted).  This theory of liability is "grounded in negligence and ratification rather than intentional discrimination." *Id.* at 1022.

After hinting that this theory of liability may not apply to "racial discrimination by persons who are not customers," the City argues that Horton has not adequately alleged that the City ratified the alleged harassment by the third parties.  City MTD at 15:12-14.  It then contends that there is "nothing the City could have done to prevent a random act of violence that occurred outside the workplace" (Horton's initial assault on August 12, 2020) and that "it appears that Horton did not notify the City of any of the alleged subsequent harassment until" February 2021,

1    after he went on leave.  *See id*. at 15:12-20.

2           The City misreads Horton's SAC.  First, it does not appear that he alleged the August 12,

3    2020, assault was based on his race.  *See generally* SAC.  Second, the SAC details at least two

4    other incidents where Horton was subjected to verbal conduct because of his race: when he was

5    called the N-word and when someone told him, "Murder the monkey."  *See id.* ¶¶ 28-29, 68.  As

6    alleged, both of these incidents occurred when Horton was working.  *See id*. ¶ 29, 68.  Horton

7    contends that he informed a security officer and his employer about these incidents, but nothing

8    was done.  *See id*. ¶¶ 28-30, 34, 68.  In addition, the SAC alleges that these incidents were

9    "unwanted" and "severe and pervasive."  *See id*. ¶¶ 67-70.  For now, this is enough for Horton's

10   Title VII hostile work environment claim to proceed against the City.

                    **b.   Retaliation (Claim 2)**

12          To state a Title VII retaliation claim, the plaintiff must show that: "(1) he engaged in a

13   protected activity; (2) his employer subjected him to an adverse employment action; and (3) a

14   causal link exists between the protected activity and the adverse action."  *Ray v. Henderson*, 217

15   F.3d 1234, 1240 (9th Cir. 2000).  The City primarily challenges Horton's retaliation claims,

16   including the one asserted under Title VII, on the third element: causation.  *See* City MTD at

17   17:18-21.

18          Noting that "causation can be inferred from timing alone where an adverse employment

19   action follows on the heels of protected activity," the City argues that "a significant period of time

20   elapsed between most of Horton's alleged protected activity and his medical separation."  *See id*.

21   at 18:4-10 (citing *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002)).  The

22   City notes that Horton allegedly complained about the accommodations process in February 2021,

23   but was not medically separated until November 30, 2021, 10 months later.  *See id*. at 18:10-13.

24   Although Horton also alleges later complaints made in June and October 2021, the City contends

25   that it is unclear if any City employee was aware of them before Horton was medically separated.

26   *Id*. at 19:1-8.[4]  In the interim, the City argues, it "granted Horton repeated extensions of medical

27   _____

28   [4] Although the City initially questions whether these complaints constituted protected activity, it
     clarifies in its reply that for the purposes of this motion, it "does not contest that the plaintiff

1    leave in order to accommodate his alleged disability." *Id*. at 18:15-16.    Horton's response largely

2    focuses on whether he sufficiently pleaded a protected activity, and does not appear to directly

3    address the City's arguments about causation or timing.  *See* First Oppo. [Dkt. No. 50] 6:1-7:26.

4    As pleaded in the SAC, Horton made his first complaint in February 23, 2021, in the form

5    of "several emails to Maria Mabutas complaining about the discrimination in the accommodations

6    process."  SAC ¶ 40.  The SAC further alleges that Horton filed "internal complaints for [Nelson]

7    verbally" and via email, though it is not clear if those complaints were separate from the emails to

8    Mabutas and if so, when they were made.  *See id*. ¶ 45.  Then, on August 19 and 20, 2021, the

9    SAC alleges that Horton emailed Narbaitz "warning [her] that her behavior plus actions were

10   extremely abusive [and] harmful," and "requested her supervisor and the process to file a

11   complaint against her."  *Id*. ¶ 55.  The latest mention of a complaint in the SAC is the one that

12   Horton allegedly filed with the California Department of Fair Employment and Housing

13   ("DFEH") and United States Equal Employment Opportunity Commission ("EEOC") on October

14   3, 2021, "regarding mistreatment by" Narbaitz and Nelson during the accommodations process.

15   *Id*. ¶ 58.

16   An exhibit attached to Horton's SAC confirms that SFPUC extended his initial leave of

17   absence (which began in December 2020) three times: from March 4, 2021, to July 16, 2021; from

18   July 17, 2021, to August 17, 2021; and again from August 18, 2021, through September 29, 2021.

19   *See id*., Ex. H ("Notice of Intent to Medically Separate.") [5]  Each of these extensions occurred after

20   Horton first complained about the accommodations process in February 2021.  *See* SAC ¶ 40.

21   The October 3, 2021 complaints made to the EEOC and DEFH offer the strongest

22   inference of retaliation in terms of timing, as Horton allegedly made them roughly three weeks

23   before he received notice of SFPUC's intent to medically separate him and less than two months

24

25   participated in a protected activity."  *See* City MTD at 19:1-8; City Reply [Dkt. No. 59] 6:18-21.

26   [5] Exhibit H can be found at pages 65-69 and 76 of the SAC, as designated by the ECF-generated

27   page numbers.  Although a court generally may not consider materials beyond the pleadings in
     deciding a Rule 12(b)(6) motion to dismiss without converting it into one for summary judgment,
     a court may consider "certain materials" without doing so, including "documents attached to the

28   complaint."  *United States v. Ritchie*, 342 F.3d 903, 907-08 (9th Cir. 2003).

before he was so separated on November 30, 2021.  *See id.* ¶¶ 58-59; Ex. H.  By this point, Horton had already been put on notice that a medical separation was possible; Exhibit H further indicates that Horton was notified in July 2021 that "SFPUC might need to proceed with medical separation if [he] could not return to work with or without a reasonable accommodation."  *See id.*, Ex. H at 66.  His leave was extended twice after this.

These facts do not allow a plausible inference that Horton was retaliated against without more allegations.  Importantly, the SAC does not allege that the defendants were aware of the October 2021 EEOC and DFEH complaints, which would support an inference that the City medically separated him because he engaged in this specific form of protected activity.  *See* SAC ¶¶ 58-59.  If there was other reason to believe that Horton was being retaliated against, it needs to be alleged.  Eight months passed between Horton's initial complaints in February 2021 and his notice of medical separation in October 2021, and an additional month followed before he was in fact separated from SFPUC.  During this time, his leave was extended three times.  Without more, this does not plausibly suggest that Horton was medically separated because he engaged in protected activity.  Accordingly, Horton's Title VII retaliation claim is DISMISSED against the City with leave to amend.[6]

### c. Constructive Discharge (Claim 3)

A claim of constructive discharge under Title VII has "two basic elements": the plaintiff "must prove first that he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign" and "must also show that he actually resigned."  *Green v. Brennan*, 578 U.S. 547, 555 (2016) (citations omitted).

---

[6] The same issue with causation sinks Horton's retaliation claims asserted under the ADA (Claim 9); FEHA (Claim 19); and section 1102.5(b) of the California Labor Code (Claim 22), each of which require the plaintiff to show a causal link between his engagement in a protected activity and an adverse employment action.  *See Garity v. APWU Nat'l Lab. Org.*, 828 F.3d 848, 863 n.16 (9th Cir. 2016) (stating the elements of an ADA retaliation claim); *Derby v. City of Pittsburg*, No. 16-CV-05469-SI, 2017 WL 713322, at *13 (N.D. Cal. Feb. 23, 2017) (stating the elements of a FEHA retaliation claim); *Derby*, 2017 WL 713322, at *11 (stating the elements of a retaliation claim under section 1102.5(b)).  These claims are also DISMISSED against the City with leave to amend.  Claim 22 is dismissed against the individual defendants as well, also with leave to amend.

1     The problem with Horton's claim is that the SAC does not allege that he resigned; instead,

2   it alleges that he was medically separated and that he had hoped to remain with his employer.  *See,*

3   *e.g.,* SAC ¶¶ 59-60.  Because Horton does not allege that he "actually resigned," nor could he, his

4   constructive discharge claim is DISMISSED with prejudice against all defendants.[7]

5   **III.     ADA CLAIMS**

6     Broadly, the ADA prohibits discrimination against people with disabilities.  *See* 42 U.S.C.

7   § 12101(b)(2).  Claims 4-9 allege various violations of the ADA.  SAC ¶¶ 76-146.

8   **a.  Disability Discrimination (Claim 4)**

9     Claim 4 alleges disability discrimination under the ADA.  SAC ¶¶ 76-87.  To establish a

10  prima facie discrimination case under the ADA, a plaintiff must show that he: "(1) is disabled; (2)

11  is qualified; and (3) suffered an adverse employment action because of [his] disability."  *Snead v.*

12  *Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1087 (9th Cir. 2001) (citation omitted).  The Ninth

13  Circuit recently reiterated that the plaintiff "carries the initial burden of establishing that she is a

14  qualified individual as part of her prima facie disability discrimination case," pursuant to the

15  language of section 12112(a) of the ADA, which "protects only 'qualified individuals' from

16  employment disability discrimination."  *Anthony v. Trax Int'l Corp.*, 955 F.3d 1123, 1127 (9th Cir.

17  2020).  The court articulated a two-step inquiry for determining whether an individual is

18  "qualified": (1) "whether the individual satisfies the prerequisites of the job" (i.e., "the requisite

19  skill, experience, education and other-job related requirements of the employment position"); and

20  (2) "whether, 'with or without reasonable accommodation,' the individual is able to perform the

21  essential functions of such position."  *Id*. at 1127-28 (citations omitted).

22    The City takes aim at the latter requirement, arguing that the SAC does not allege that

23

24  ---
    [7] Claim 21, which alleges that Horton was constructively discharged in violation of FEHA, fails
25  for the same reason: Horton does not allege that he resigned.  *See* SAC ¶¶ 59-60, 193-195.  "In
    order to establish a constructive discharge, an employee must plead and prove . . . that the
26  employer either intentionally created or knowingly permitted working conditions that were so
    intolerable or aggravated *at the time of the employee's resignation* that a reasonable employer
27  would realize that a reasonable person in the employee's position would be compelled to resign."
    *Turner v. Anheuser-Busch, Inc.*, 7 Cal. 4th 1238, 1244 (1994) (emphasis added); *see also id*. at
28  1244 ("Constructive discharge occurs when the employer's conduct effectively forces an
    employee to resign.").  Claim 21 is also DISMISSED with prejudice.

United States District Court
Northern District of California

Horton was able to perform the functions of his job, either with or without a reasonable accommodation. *See* City MTD at 20:11-20. As pleaded, the City notes, Horton's duties "encompassed building operation and maintenance, and related functions, all of which would require him to be on-site." *Id*. at 20:11-12 (citing SAC ¶ 7). The City then argues that Horton's requested accommodations—telework and a leave of absence—precluded him from performing these essential functions. *Id*. at 20:11-22.

I agree with the City that the SAC alleges a variety of job duties that would appear to require Horton to be on-site, including the inspection, maintenance, and repair of "all equipment, machinery, and systems." *See* SAC ¶ 80. However, the SAC also alleges that employees in Horton's department were allowed to work remotely from April to August 2020. *See id*. ¶ 12. It also asserts that Horton requested other accommodations—including schedule modifications, the parking pass, and removal from outside rounds—that might have allowed him to work on-site. *See id*. ¶¶ 18-19, 78. Accepting these allegations as true and drawing all reasonable inferences in Horton's favor, as I must on a motion to dismiss, it is plausible that had some of these accommodations been made, he could have performed the essential functions of his job, even if it required him to be on-site.

The ADA disability discrimination claim may proceed as pleaded against the City.

### b. Disparate Treatment (Claim 5)

Claim 5 alleges disparate treatment under the ADA. SAC ¶¶ 88-90. To state such a claim, a plaintiff must demonstrate either that "a discriminatory animus is the sole reason for the challenged action or that discrimination is one of two or more reasons for the challenged decision, at least one of which may be legitimate." *Mendoza v. The Roman Cath. Archbishop of Los Angeles*, 824 F.3d 1148, 1150 (9th Cir. 2016) (citation and quotation marks omitted).

There is a fundamental flaw with Horton's disparate treatment claim: He alleges that he was discriminated against based on his "national origin, black American." *See* SAC ¶ 89; *see also* ¶ 90 ("Horton's national origin was the determining factor and/or a motivating factor in defendants' adverse employment action."). But the ADA prohibits discrimination "on the basis of disability," not race or national origin. *See* 42 U.S.C. 12112(a).

1    Claim 5 is DISMISSED against the City with leave to amend.

2        **c.   Failure to Provide Reasonable Accommodations (Claim 6)**

3    Claim 6 alleges a violation of the ADA for failing to reasonably accommodate Horton's

4    disability.   SAC ¶¶ 91-115.  The elements of a failure-to-accommodate claim closely mirror those

5    of a prima facie discrimination claim under the ADA.  The plaintiff must show: "(1) he is disabled

6    within the meaning of the ADA; (2) he is a qualified individual able to perform the essential

7    functions of the job with reasonable accommodation; and (3) he suffered an adverse employment

8    action because of his disability."  *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233,

9    1237 (9th Cir. 2012) (citation omitted).

10    The City again argues that the claim fails because Horton has not shown that he was able

11    to perform the essential functions of his job with or without an accommodation.  *See* City MTD at

12    20:1-21:5.  I have already addressed and rejected this argument.  With no other challenge to

13    Horton's failure-to-accommodate claim, it may also proceed as pleaded against the City.

14        **d.   Hostile Work Environment (Claims 7 and 8)**

15    Claims 7 and 8 allege a hostile work environment in violation of the ADA.  SAC ¶¶ 116-

16    138.  The Ninth Circuit has not expressly stated whether such a claim exists.  *See Green v. City &*

17    *Cnty. of San Francisco*, No. 17-CV-00607-TSH, 2021 WL 3810243, at *48 (N.D. Cal. Aug. 26,

18    2021) ("The Ninth Circuit has not definitively decided whether or not a claim may be asserted

19    under the ADA predicated on an alleged hostile work environment created by disability

20    harassment.").  However, the court has assumed that if such a claim exists within this circuit, the

21    Title VII standard would apply.  *See Garity v. APWU Nat'l Lab. Org.*, 655 Fed. App'x 523, 524

22    (9th Cir. 2016) (citing *Walsh v. Nev. Dep't of Human Res.*, 471 F.3d 1033, 1038 (9th Cir. 2006)).

23    For the purposes of this motion only, I will assume (without deciding) that a hostile work

24    environment claim may be asserted under the ADA, and that the required elements track those of a

25    Title VII hostile work environment claim.  Accordingly, Horton must plausibly show that he was

26    "subjected to verbal or physical conduct" because of his disability; (2) "the conduct was

27    unwelcome"; and (3) "the conduct was sufficiently severe or pervasive to alter the conditions of

28    [his] employment and create an abusive work environment."  *See Manatt*, 339 F.3d at 798.

United States District Court
Northern District of California

13

Horton has not sufficiently alleged that the conduct underlying these claims was because of his disability.  The SAC alleges that Horton was "subjected to harassment" by Mabutas, Narbaitz, and Nelson, by way of: (1) "threats" from Nelson and Narbaitz that he would be medically separated, and (2) the denial of his accommodations requests.  *See* SAC ¶¶ 116-138.  Elsewhere, the SAC alleges that Horton was "pressured to return to work" due to a staff shortage, that Narbaitz erroneously stated his job duties during the interactive accommodations process, and that Narbaitz and Nelson requested additional medical paperwork.  *See id*. ¶¶ 41, 45-46, 49.  These actions may be evidence for his disability discrimination claim, but it is unclear how many of these actions constitute harassment or that they were sufficiently severe or pervasive to constitute a hostile work environment.  Claims 7 and 8 are thus DISMISSED against the City with leave to amend.

### IV.    CALIFORNIA LABOR CODE CLAIMS

Claims 10 and 11 allege violations of sections 230(c) and 230.1 of the California Labor Code.  SAC ¶¶ 147-153.  Claim 14 alleges a violation of section 230(e); Claim 25 a violation of section 6310; and Claim 26 a violation of section 6311.  *Id*. ¶¶ 164-167, 209-214.

The defendants' sole argument against these statutes is that they do not create a private cause of action.  *See* City MTD at 21:17-22:12; Individual Defs.' Mot. to Dismiss ("Individual Defs.' MTD") [Dkt. No. 48] 14:14-24; Narbaitz Mot. to Dismiss ("Narbaitz MTD") [Dkt. No. 49] 17:15-18:17.  They point to other provisions in support: California Labor Code section 230(h)(1), which states that an employee alleging violations of sections 230(c) and (e) "may file a complaint with the Division of Labor Standards Enforcement of the Department of Industrial Relations pursuant to section 98.7"; section 230.1(d)(1), which states the same regarding violations of 230.1(a); and section 98.7, which provides a framework for the Labor Commissioner to investigate complaints.  *See, e.g.*, City MTD at 22:3-12.  Notably, none of the defendants cite any case law or other authority confirming that sections 230, 230.1, 6310, and 6311 do not provide a private right of action, nor did they proffer any at oral argument.  *See* City MTD at 21:17-22:12; Individual Defs.' MTD at 14:14-24; Narbaitz MTD at 17:15-18:17.

I am not convinced by the defendants' argument.  Beginning with sections 6310 and 6311,

section 6312 is informative.  It provides:

> Any employee who believes that he or she has been discharged or otherwise discriminated against by any person in violation of section 6310 or 6311 may file a complaint with the Labor Commissioner pursuant to section 98.7.

Cal. Lab. Code § 6312.

California courts have relied on section 6312 in rejecting arguments that plaintiffs did not have a direct right of action under section 6310 and did not need to exhaust administrative remedies before filing a section 6310 claim.  *See, e.g.*, *Cabesuela v. Browning-Ferris Industries of Cal., Inc.*, 68 Cal. App. 4th 101, 109-10 (1998) (rejecting the defendants' argument that the "sole manner to enforce section 6310 is through a proceeding before the Labor Commissioner pursuant to section 6312" and that the plaintiff held no direct right of action under section 6310).  The analysis in *Sheridan v. Touchstone Television Productions, LLC*, 241 Cal. App. 4th 508, 512-13 (2015), bears mentioning.  There, the court held that the plaintiff was not required to first administratively exhaust her section 6310 claim, in part because section 6312 states that a person who believes she has been discriminated against in violation of sections 6310 or 6311 "'may,' not 'shall' file a complaint with the Labor Commissioner."  The court reasoned that "'[s]hall' is mandatory and 'may' is permissive," and "[t]hus, a straightforward reading of the statutes establishes an administrative claim is permitted, but not required."  *Id*. at 513 (citations omitted).  The Ninth Circuit endorsed a similar view in *Freund v. Nycomed Amersham*, 347 F.3d 752, 759 (9th Cir. 2003), rejecting Nycomed's argument that "because administrative remedies are provided for violations of [section] 6310, they are exclusive."

Section 98.7 uses similarly permissive language, as noted by the *Sheridan* court.  *See* 241 Cal. App. 4th at 512-13.  One subsection states that a person who believes they have been discharged or discriminated against "in violation of any law under the jurisdiction of the Labor Commissioner *may* file a complaint" with the Division of Labor Standards Enforcement.  Cal. Lab. Code § 98.7(a)(1) (emphasis added).  Another states that "[i]f a complainant files an action in court against an employer based on the same or similar facts as a complaint made under this section, the Labor Commissioner may, at the commissioner's discretion, close the investigation."

United States District Court
Northern District of California

1   *Id.* § 98.7(b)(1).  Subsection (f) confirms that "[t]he rights and remedies provided by this section

2   do not preclude an employee from pursuing any other rights and remedies under any other law."

3   *Id.* § 98.7(f).  And subsection (g) confirms that "there is no requirement that an individual exhaust

4   administrative remedies or procedures."  *Id.* § 98.7(g).

5        Read together, this supports a private right of action under sections 6310 and 6311.

6   Sections 230 and 230.1 use similar language, stating that an employee *may* file a complaint with

7   the Division of Labor Standards Enforcement pursuant to section 98.7.  *See id.* §§ 230(h)(1),

8   230.1(d)(1).  As the *Sheridan* court noted, "may" is not the same as "shall," and section 98.7

9   indicates that a complainant may also pursue his claims in court.

10        The defendants may ultimately proffer some case law or other authority that definitely

11   proves their argument or otherwise thwarts these claims.  But they have not done so at this point.

12   For now, Claims 10-11, 14, and 25-26 may proceed as pleaded against all defendants.  If plaintiff

13   amends the SAC, however, he should identify which defendants he alleges are responsible for

14   each claim.

15   ### V.       CALIFORNIA GOVERNMENT CODE CLAIMS

16        Claim 12 alleges a violation of California Government Code section 815.6.  SAC ¶¶ 154-

17   159.  Claims 15-18, and 20 allege various violations of FEHA, which is also found within the

18   California Government Code: section 12940(d), (j), (k), (m), and (n).  *Id.* ¶¶ 168-184, 190-192.

19   #### a.   Section 815.6 (Claim 12)

20   Section 815.6 of the California Government Code provides:

21        Where a public entity is under a mandatory duty imposed by an enactment that is
22        designed to protect against the risk of a particular kind of injury, the public entity is
        liable for an injury of that kind proximately caused by its failure to discharge the
23        duty unless the public entity establishes that it exercised reasonable diligence to
        discharge the duty.

24   There are three elements to a section 815.6 claim: "(1) the enactment at issue must impose a

25   mandatory duty on the public entity, meaning that the enactment is obligatory, rather than merely

26   discretionary or permissive"; (2) "the mandatory duty must be designed to protect against the

27   particular kind of injury the plaintiff suffered"; and (3) "the public entity's breach of the

28

United States District Court
Northern District of California

mandatory duty must have been a proximate cause of the plaintiff's injury." *Cohen v. Cnty. of Santa Cruz*, No. 16-CV-06404-LHK, 2017 WL 467846, at *4 (N.D. Cal. Feb. 3, 2017) (citation, quotation marks, and modifications omitted).  Importantly, to state a claim under section 815.6, a plaintiff "must identify a specific statute declaring the entity to be liable, or at least creating some specific duty of care by the agency in favor of the injured party." *Id*. (same).

The City contends that the claim fails because Horton has not identified a specific statute imposing a mandatory duty upon it.  City MTD at 23:1-24:4.  According to the City, the first statute he cites, California Labor Code section 230.1, only prohibits conduct and does not create a mandatory duty for the purposes of section 815.6.  *See id*. at 23:11-23.  The City further argues that Horton's allegations that the defendants "failed to engage in mandatory *Skelly* mandate hearing" does not suffice, because as used in section 815.6, "'enactment' means a constitutional provision, statute, charter provision, ordinance, or regulation"—not a judicially created right.  *See id*. at 23:24-24:4 (citing Cal. Gov't Code § 810.6).

I agree with the City.  Statutes that "merely prohibit[] certain conduct" rather than "set forth guidelines or rules for a public entity to follow in implementing an affirmative duty," do not create a mandatory duty under section 815.6.  *See Herrera v. Los Angeles Unified Sch. Dist.*, No. CV-17-00069, 2017 WL 7888037, at *5 (C.D. Cal. Nov. 6, 2017); *see also Clausing v. San Francisco Unified Sch. Dist.*, 221 Cal. App. 3d 1224, 1239 (1990) (stating that for section 815.6 to apply, the enactment cannot "simply set forth a prohibition or a right, as opposed to an affirmative duty on the part of a government agency to perform some act").  Although Horton does not specify which provision of section 230.1 he invokes, that statute prohibits employers from discharging, discriminating, or retaliating against employees who are victims of certain crimes to take time off from work for certain reasons.  *See* SAC ¶ 155; *see also* Cal. Lab. Code § 230.1.  A prohibition, without an affirmative duty, is not enough to constitute an "enactment" under section 815.6.  Nor is judicially created law, as indicated by the definition of "enactment" in section 810.6.  Horton does not proffer any case law or other authority suggesting otherwise.  *See* First Oppo. at 13:21-15:10.

The City overlooks a third statute cited by Horton in the SAC: California Government

1   Code section 31725.  *See* SAC ¶ 156.  This statute provides that "[p]ermanent incapacity for the

2   performance of duty shall in all cases be determined by" a county board; it does not impose a

3   mandatory duty on the City to act.  *See* Cal. Gov't Code § 31725.

4        For these reasons, Horton's section 815.6 claim is DISMISSED with leave to amend only

5   against the City.

6           **b.  Section 12940(d) (Claim 15)**

7        Section 12940(d) of FEHA prohibits employers from "print[ing] or circulat[ing] or

8   caus[ing] to be printed or circulated any publication" or "mak[ing] any nonjob-related inquiry of

9   an employee or applicant, either verbal or through use of an application form, that expresses,

10  directly or indirectly, any limitation, specification, or discrimination as to," among other things, a

11  physical or mental disability.  Cal. Gov't Code § 12940(d).

12       Horton alleges that the defendants violated this provision by issuing parking passes to

13  employees who did not have disabilities and not him, which he contends "exposed [his] disability

14  and impairments" to his coworkers.  SAC ¶ 169; *see also* ¶ 23 (alleging that "[o]ther employees

15  learned indirectly that [Horton] had a disability via these events against [his] wishes").  The

16  defendants respond that the claim should be dismissed because Horton does not allege any

17  "publication," "nonjob-related inquiry," or "application form" that expressed "any limitation,

18  specification, or discrimination" related to a protected characteristic.  City MTD at 26:3-11;

19  Individual Defs.' MTD at 16:4-19; Narbaitz MTD at 20:9-23.

20       Horton has not plausibly shown how the issuance of the parking passes falls within the

21  ambit of section 12940(d).  First, as the defendants note, he does not tie the parking passes to a

22  "publication" or "nonjob-related inquiry," made verbally or via an application form, that expressed

23  his disability.  *See* SAC ¶¶ 168-170.  Moreover, the SAC does not sufficiently explain how the

24  issuance of the parking passes led to any disclosure of his disability by the City or any other

25  defendant.  Horton slightly elaborates in his opposition, stating that "[t]he mere fact of giving

26  unrequested or unsolicited parking passes to employees who did not have a disability caused an

27  uproar of inquiry which eventually led to the indirect exposure of [Horton's] nonjob-related

28  disability," as "coworkers inquired why [Horton] was excluded from the passes."  *See* First Oppo.

United States District Court
Northern District of California

at 16:27-17:4.  But those allegations are not in the SAC itself.  Even if they were, Horton would need to further explain how issuing a limited number of parking passes to employees without disabilities exposed Horton's disability.  It is plausible that issuing a parking pass to an employee could indicate to others that he had a disability, particularly if the number of passes were limited.  But as alleged, I cannot reasonably infer that denying Horton a parking pass did so.

Claim 15 is DISMISSED with leave to amend against all defendants.

### c.  Section 12940(m) (Claim 16)

California Government Code section 12940(m) declares it unlawful for an employer "to fail to make reasonable accommodation for the known physical or mental disability" of an employee.  Cal. Gov't Code § 12940(m)(1).  To state a failure to accommodate claim under FEHA, the plaintiff must show: (1) that he has a disability under FEHA; (2) that he is qualified to perform the essential functions of the position; and (3) the employer failed to reasonably accommodate his disability.  *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 498 (9th Cir. 2015).

The City challenges Horton's FEHA failure to accommodate claim on the same grounds that it challenges his failure to accommodate claim asserted under the ADA, arguing that he has not shown that he was able to perform the essential functions of his job with or without accommodation.  *See* City MTD at 20:3-10.  This argument falls short, for reasons I have already explained.  With no other challenge to Claim 16, it may proceed as pleaded against the City.

### d.  Section 12940(n) (Claim 17)

"Under FEHA, an employer's failure 'to engage in a timely, good faith, interactive process with the employee . . . to determine effective reasonable accommodations' is a violation of the statute separate from any failure to make reasonable accommodations for a qualified employee's disability." *Achal v. Gate Gourmet, Inc.*, 114 F. Supp. 3d 781, 799-800 (N.D. Cal. 2015) (citing in part Cal. Gov't Code § 12940(n)).  This process "requires that both sides must communicate directly, exchange essential information and neither side can delay or obstruct the process." *Alejandro v. ST Micro Elecs., Inc.*, 129 F. Supp. 3d 898, 912 (N.D. Cal. 2015) (citation and quotation marks omitted).  The court's "ultimate obligation is to isolate the cause of the breakdown" in that process "and then assign responsibility, so the employer may be liable only if

United States District Court
Northern District of California

the employer is responsible for the breakdown of the interactive process."  *See id*. (same).

Horton does not deny that the interactive process occurred; instead, he alleges that it was "highly abusive, exploitative," "not in good faith and . . . extremely non-interact[ive]."  SAC ¶ 175.  It further alleges that Horton's employer "refused to meet [him] on middle grounds and engaged in bullying," and "insisted that leave was all they had to provide."  *Id*.  Similar allegations appear elsewhere the SAC, where Horton describes the process as "very disruptive, non-interactive, abusive, and combative," and alleges that Narbaitz and Nelson "never intended to act in good faith."  *Id*. ¶¶ 45-46.  The City contends that Horton's "description of the interactive process is conclusory at best" and that the exhibits attached to the SAC "suggest[] that he, not his employer, was responsible for the breakdown in that process."  City MTD at 27:3-4.

Horton is proceeding pro se, and his complaint must be read liberally.  While I appreciate the City's concern about lack of detail, this claim is plausible.  It may proceed as pleaded against the City.

### e.   Section 12940(j) (Claim 18)

FEHA also prohibits disability-based harassment of employees.  Cal. Gov't Code 12940(j).  "[H]arassment consists of conduct outside the scope of necessary job performance" and "is not conduct of a type necessary for management of the employer's business or performance of the supervisory employee's job."  *Reno v. Baird*, 18 Cal. 4th 640, 645-46 (1998) (citing *Janken v. GM Hughes Elecs.*, 46 Cal. App. 4th 55, 63 (1996))).  So, "personnel management actions" such as hiring or firing, job or project assignments, office or work station assignments, and the provision of support, "do not come within the meaning of harassment."  *Id*. at 646-47 (same).  "These actions may retrospectively be found discriminatory if based on improper motives, but in that event the remedies provided by the FEHA are those for discrimination, not harassment."  *Id*. at 647 (same).

The City again argues that that the harassment alleged by Horton—including the refusal to provide reasonable accommodations, and actions during the interactive accommodation and medical separation process—are personnel management decisions that do not support a FEHA harassment claim.  *See* City MTD at 16:11-20.  The case law supports the City's position.  As

United States District Court
Northern District of California

alleged in the SAC, the harassment either constitutes a personnel management decision (i.e., discussions of medical separation or denial of Horton's accommodations requests) or are too conclusory (i.e., that Horton was "pressured to return to work" due to a staff shortage, that Narbaitz misstated his job duties during the accommodations process, and that Narbaitz and Nelson requested additional paperwork) to support Horton's claim. *See* SAC ¶¶ 41, 45-46, 49. The FEHA harassment claim is therefore DISMISSED against the City with leave to amend.

### f.   Section 12940(k) (Claim 20)

California Government Code section 12940(k) makes it unlawful for an employer "to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring." The sole argument that the City makes against this claim is that it fails because Horton's predicate claims of discrimination and harassment fail. City MTD at 27:20-26; City Reply at 12:9-19.  For reasons I have explained, Horton has stated a claim of disability discrimination and adequately alleged harassment, at least as part of his Title VII hostile work environment claim.  With no other arguments from the City, Claim 20 may proceed as pleaded against the City.

### VI.   *SKELLY* CLAIM

Claim 13 asserts a violation of "Personnel Rule 52.3," the source of which is unclear, but appears to allege a violation of Horton's *Skelly* rights.  *See* SAC ¶¶ 160-163.  "A *Skelly* hearing refers to the due process meeting required under *Skelly v. State Personnel Board*, 15 Cal. 3d 194 (1975), when a public employee faces a potential deprivation of his or her property interest as an employee." *Lopez v. City & Cnty. of San Francisco*, No. 12-CV-06523-MEJ, 2014 WL 2943417, at *1 n.1 (N.D. Cal. June 30, 2014).  At minimum, under *Skelly* "preremoval safeguards must include notice of the proposed action, the reasons therefor, a copy of the charges and materials upon which the action is based, and the right to respond." 15 Cal. 3d at 215.

The SAC alleges that Horton was denied "the process he was due as a permanent public employee to challenge [SFPUC's] conclusion that he was disabled and that he should be terminated."  SAC ¶ 161.  He further alleges that he was "never allowed nor notified of his rights to a Skelly Mandate hearing with or without a union rep present" and "never notified of the grievance process by an employer available with the union."  *Id*. ¶¶ 162-63.

As the defendants note, however, the documents attached to Horton's SAC indicate otherwise. Exhibit H is a "Notice of Intent to Medically Separate" sent to Horton on October 23, 2021. *See id.*, Ex. H. This letter, signed by Narbaitz, informs Horton: (1) that SFPUC was recommending that he be medically separated from his employment as a stationary engineer; (2) the reasons underlying that recommendation (including a timeline of events related to Horton's leave and request for accommodations); (3) notice of a November 1, 2021, "interactive process meeting" in which Horton would "have the opportunity to meet with [Narbaitz] to raise any objections to or concerns you may have with the recommendation," or, alternatively, Horton's ability to respond in writing. *See id.* It also stated that Horton could bring a representative of his choice to the meeting, along with "other people who have information that may assist the SFPUC as it considers this recommendation." *See id.* It also stated that Horton could submit any relevant materials for the SFPUC's consideration. *See id.*

Another letter attached to the SAC informs Horton that he was medically separated from his employment. *See id.*, Ex. G. The contents of that letter state that the November 1, 2021, meeting between Narbaitz and Horton occurred by phone and that "[d]uring this call, [Horton] confirmed that [he] had no information—other than the information [he] had previously submitted—for the SFPUC to consider regarding the notice" of SFPUC's intent. *See id.*

Taken together, these exhibits suggest that Horton's *Skelly* rights were satisfied. He was provided notice of SFPUC's intent to medically separate him, the reasons why, materials upon which the action was based, and afforded the right to respond. *See Skelly*, 15 Cal. 3d at 215. Indeed, he did so respond, by participating in the phone call with Narbaitz and declining to provide additional information.

The SAC's allegations about any *Skelly* violation are too conclusory to proceed. Horton alleges that the defendants did not "notify [him] of time sensitive union grievances that were available and intentionally withheld time sensitive information," without explaining what that information was or why the defendants were obligated to provide him union-related information. *See* SAC ¶ 162.

Horton attempts to supplement the SAC in one of his oppositions, arguing that "[t]hey

failed to inform me that the informal hearing via phone call was the actual *Skelly* hearing" and that Narbaitz was not a neutral officer. *See* First Oppo. at 15:12-16:10. While these allegations may ultimately support a *Skelly* claim, "[i]t is axiomatic that the complaint may not be amended by briefs in opposition to a motion to dismiss." *Barbera v. WMC Mortg. Corp.*, No. C-04-3738-SBA, 2006 WL 167632, at *2 n.4 (N.D. Cal. Jan. 19, 2006). As pleaded, the SAC does not plausibly state a *Skelly* violation.

The *Skelly* claim is DISMISSED. Because additional allegations may support such a claim (if they are included in an amended complaint), I will grant Horton leave to amend with respect to all defendants.

## VII.    UNRUH ACT CLAIM

Claim 23 alleges a violation of California Civil Code section 51. SAC ¶¶ 201-204. Known as the Unruh Civil Rights Act, section 51 entitles all persons within California to "the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever," regardless of their sex, race, color, disability, medical condition, or other characteristics. *See* Cal. Civ. Code § 51(b). The California Supreme Court recently held that the Unruh Act's purpose and legislative history "make clear that the focus of the Act is the conduct of *private business establishments*," rather than "the actions of state actors." *See Brennon B. v. Superior Ct.*, 13 Cal. 5th 662, 675 (2022); *see also id.* at 679 ("[W]e conclude that, in passing the Unruh Civil Rights Act, the Legislature enacted a law directed at entities operating as private businesses.").

As pleaded, Claim 23 is difficult to follow, as it invokes section 51, California Government Code section 12940(a), and section 5(a)(1) of OSHA. *See* SAC ¶¶ 201-204. To the extent that it alleges a violation of section 51, the City and individual defendants each argue that the claim cannot proceed because they are not business establishments. *See* City MTD at 28:1-18; Individual Defs.' MTD at 19:23-20:12; Narbaitz MTD at 24:17-25:8.

Horton does not challenge this assertion in opposing the City's motion, nor does he proffer any case law or other authority suggesting that a public utility company may be held liable under the Unruh Act. *See* First Oppo. at 22:26-23:2 ("The City is not a business establishment and

1   therefore cannot be held liable under the Unruh Civil Rights Act. . . . I have no opposition to the

2   issues the law does not provide or allow claims.").  He also concedes that this claim is not asserted

3   against the individual defendants.  *See* Second Oppo. at 17:28-18:1 ("At no point during the

4   claims are individuals being alleged to be held liable."); Third Oppo. at 16:9 (same).

5        To the extent that Horton alleges "wrongful constructive discharge in violation of

6   California public policy," as explained above, he has not adequately alleged that he resigned, as

7   required to allege a constructive discharge.  *See* SAC ¶¶ 201-204.

8        Horton's Unruh Act claim is therefore DISMISSED with prejudice against all defendants.

9   **VIII.   OSHA CLAIM**

10        Claim 24 alleges a violation of OSHA's general duty clause, found in section 5(a)(1).  *See*

11   SAC ¶¶ 206-208 (referencing 29 U.S.C. § 654(a)(1)).

12        The problem with this claim is that "OSHA does not provide a private right of action."

13   *Boyd v. Accuray, Inc.* No. 11-CV-01644-LHK, 2012 WL 4936591, at *6 (N.D. Cal. Oct. 17, 2012)

14   (citation omitted); *see also Clark v. Wells Fargo Bank*, 669 Fed. App'x 362, 363 (9th Cir. 2016)

15   ("OSHA does not provide a private right of action."); *Farr v. Pac. Gas & Elec. Co.*, No. 21-CV-

16   08099-JSW, 2022 WL 1188866, at *2 (N.D. Cal. Apr. 21, 2022) (OSHA "expressly provides for

17   enforcement of its safety and health standards through administrative procedures").[8]  Horton does

18   not dispute this or provide any authority to the contrary, and instead states that he does not oppose

19   dismissal if the provision "does not permit lawsuits against individuals or public entities."  *See*

20   First Oppo. at 23:4-7.

21        Horton's OSHA claim is DISMISSED with prejudice against all defendants.

22   **IX.     TORT CLAIMS**

23        Finally, the SAC alleges tort claims: negligent supervision (Claim 27), intentional

24   infliction of emotional distress ("IIED") (Claim 28); and negligent infliction of emotional distress

25   (Claim 29).  SAC ¶¶ 215-224.

26        The primary issue with Horton's tort claims is that he fails to allege them with any

27

28   _____

[8] Although *Clark* is an unpublished memorandum disposition, it is persuasive given the case law.

specificity as to any of the named defendants.  The only defendants expressly named in any of these claims are Mabutas, Herrera, and Gardunio, who allegedly signed Horton's "termination documents."  *See id.* ¶ 218.  Otherwise, it is unclear who Horton aims his tort claims toward, and what specific allegations he makes in support.  Although Horton is representing himself in this matter—no simple task in federal court—and I construe his claims liberally as a result, he must identify the specific defendants and alleged actions underlying the tort claims so that I can assess whether he has plausibly stated a claim.

Claims 27, 28, and 29 are therefore DISMISSED with leave to amend.  Should Horton file an amended complaint, he should clearly articulate: (1) who he alleges these claims against; and (2) the specific allegations supporting each claim.

## CONCLUSION

The motions to dismiss are GRANTED in part and DISMISSED in part, in the manner described above.  Any amended complaint will be due 30 days after counsel is appointed for Horton.

**IT IS SO ORDERED.**

Dated: March 16, 2023

William H. Orrick
United States District Judge

United States District Court
Northern District of California

25