1   DAVID CHIU, State Bar #189542
    City Attorney
2   ROSE DARLING, State Bar #243893
    Chief Labor Attorney
3   ADAM SHAPIRO, State Bar 267429
    Deputy City Attorney
4   Fox Plaza
    1390 Market Street, 5th Floor
5   San Francisco, California 94102-5408
    Telephone:    (415) 554-3830
6   E-Mail:       adam.shapiro@sfcityatty.org

7   Attorneys for Defendants City
    and County of San Francisco, San Francisco
8   Public Utilities Commission

9
                    UNITED STATES DISTRICT COURT
10
                  NORTHERN DISTRICT OF CALIFORNIA
11

12  CORY A. HORTON, SR.,                    Case No. 3:22-cv-03174-WHO

13          Plaintiff,                       **DEFENDANTS' NOTICE OF MOTION,
                                             MOTION, AND MEMORANDUM OF POINTS
14      vs.                                  AND AUTHORITIES IN SUPPORT OF
                                             DEFENDANTS' MOTION FOR SUMMARY
15  CITY AND COUNTY OF SAN                   JUDGMENT**
    FRANCISCO, SAN FRANCISCO PUBLIC
16  UTILITIES COMMISSION,                    Hearing Date:      October 16, 2024
                                             Hearing Judge:     William H. Orrick
17          Defendants.                      Time:              2:00 PM
                                             Place:             Zoom Video Conference
18                                                              San Francisco Courthouse
                                                                Courtroom 2, 17th Floor
19                                                              450 Golden Gate Avenue
                                                                San Francisco, CA 94102
20
                                             Date Action Filed: May 31, 2022
21                                           Trial Date:        February 18, 2025

22                                           Attached Documents: Declarations of Adam M.
                                             Shapiro, Maria Mabutas, Rachel Gardunio, Silvia
23                                           Recinos, Michael Ho, Amanda Higgins

24

25

26

27

28
                                             i

1

2

TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. iv

NOTICE OF MOTION AND MOTION ............................................................................... viii

MEMORANDUM OF POINTS AND AUTHORITIES ...........................................................1

INTRODUCTION ....................................................................................................................1

FACTUAL BACKGROUND ...................................................................................................3

I.  Horton's Employment With the City Was Brief, And He Never Became A Permanent Employee. ...............................................................................................3

II.  SFPUC Needed Horton To Work Onsite, But Allowed Him To Take Training Courses From Home A Few Days Per Week For A Brief Period Early In The Pandemic. ..................................................................................................................4

III.  August 2020: Horton Is Assaulted, SFPUC Offers Horton Various Safety Accommodations, And Horton Thanks His Managers For Their Response. ..........4

IV.  Unidentified Persons Allegedly Yell Racial Epithets At Horton On The Street Outside of 525 Golden Gate; Horton Declines To Report The Two Incidents To His Supervisors. ........................................................................................................7

V.  December 2020: Horton Unexpectedly Goes Out On Paternity Leave ..................8

VI.  February 2021: For The First Time, Horton Tells His Supervisors He Was Stalked Between August and December 2020. ........................................................8

VII.  February 2021: For The First Time, Horton Complains To His Supervisors About Their Response To The August 12 Assault. ..................................................9

VIII.  February 2021: For The First Time, Horton Seeks Medical Attention And Requests A Reasonable Accommodation For An Alleged Disability. ....................9

IX.  February To April 2021: Nelson Asks Horton For Documentation of Specific Work Restrictions And Repeatedly Extends Horton's Leave After Horton Submits Three Medical Notes From Girton Stating Horton Is Unable to Work. ..10

X.  April 27 To May 10 2021: Horton Complains After Nelson Warns Horton He May Be Medically Separated If He Is Unable To Return To Work; Nelson Continues To Request Horton Provide More Specific Work Restrictions. ..........11

XI.  June To July 2021: Horton Represents He Is Unable To Work And Again Declines to Provide Specific Work Restrictions; Nelson Further Extends Horton's Leave ..........................................................................................................12

XII.  August 2021: Narbaitz Provides Horton With A Final Leave Extension Through September And Offers Horton Various Options For Returning To Work; Horton Again Declines To Provide Specific Work Restrictions and Accuses Narbaitz Of Misconduct. ......................................................................................................13

Horton v. CCSF - CCSF MSJ
CASE NO. 3:22-cv-03174-WHO

n:\labor\li2022\220258\01623450.docx

XIII.   October to November 2021: SFPUC Medically Separates Horton After Horton Declines To State When Or Under What Circumstances He Can Return To Work. ...............................................................................................................14

XIV.   February 2022: Horton Files A Complaint For Discrimination and Retaliation With DFEH And EEOC. .................................................................................15

PROCEDURAL HISTORY .........................................................................................................16

LEGAL STANDARD ....................................................................................................................16

ARGUMENT ..................................................................................................................................17

I.   Claim No. 1: Horton's Title VII Racial Harassment Claim Fails. .........................17

   A.   Horton Failed To Exhaust Administrative Remedies For His Harassment Claim. ..........................................................................................................17

   B.   Horton Concedes The Assault And Alleged Stalking Were Not Racially Motivated. ...................................................................................................17

   C.   The "N-Word" and "Monkey" Incidents Were Perpetrated By Third Parties Outside The Workplace And Do Not Constitute Severe And Pervasive Harassment. .................................................................................18

   D.   Horton Cannot Establish A Title VII Third Party Harassment Claim Because He Failed To Properly Report the Alleged Harassment. .............18

II.   Claim No. 9: Horton Was Not Entitled To A *Skelly* Hearing Because He Was A Non-Permanent Employee, And Horton Waived Any Right He May Have Had To Challenge Pre-Termination Proceedings. ..........................................................20

III.   Claim Nos. 3-5, 11-12: The Undisputed Evidence Shows Horton Cannot Prevail On His ADA & FEHA Disability Discrimination Claims ...................................21

   A.   Horton's 2020 Disability Discrimination Claims Fail Because The City Was Unaware of Horton's Alleged Disability Until February 2021. ........21

   B.   Horton's 2021 Disability Discrimination Claims Fail Because He Could Not Perform The Essential Functions Of His Job And Because He Refused To Engage In The Interactive Process. ........................................24

IV.   Claim No. 17: Horton's Labor Code § 6311 Claim Fails Because Horton Cannot Prove Causation, Horton Did Not Refuse To Work Due To Safety Violations, and Horton Cannot Prove A Real and Apparent Hazard. ......................................31

V.   Claim Nos. 2, 6, 13, 15: Horton's Title VII, ADA, FEHA, and Labor Code § 1102.5 Retaliation Claims Fail Because Horton Cannot Prove Causation. ...........33

VI.   Claim No. 14: Horton's FEHA Claim For Failure To Prevent Discrimination And Harassment Fails Because Horton Cannot Prove Any Discrimination Or Harassment Occurred. ..................................................................................................35

CONCLUSION ..............................................................................................................................35

1

**TABLE OF AUTHORITIES**

2

**Cases**

*Allen v. Pac. Bell,*
  348 F.3d 1113 (9th Cir. 2003) ................................................................27

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986).............................................................................16

*B.K.B. v. Maui Police Dept.,*
  276 F.3d 1091, 1099 (9th Cir. 2002) ............................................. viii, 17

*Bates v. United Parcel Serv., Inc.,*
  511 F.3d 974 (9th Cir. 2007) ............................................................ ix, 25

*Beck v. University of Wisconsin Bd. of Regents,*
  75 F.3d 1130 (7th Cir. 1996) ...............................................................28

*Brown v. City of Tucson,*
  336 F.3d 1181 (9th Cir. 2003) ......................................................... ix, 33

*Caldwell v. OS Rest. Servs., LLC,*
  CV 19-00754 DMG (MRWx), (C.D. Cal. May 13, 2021) .................. ix, 31

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986)..............................................................................16

*Dark v. Curry Cnty.,*
  451 F.3d 1078 (9th Cir. 2006) ..............................................................26

*Diego v. City of Los Angeles,*
  15 Cal.App.5th 338 (2017) ...................................................................34

*Frazier v. United Parcel Serv., Inc.,*
  No. 1:02CV6509OWWDLB, 2005 (E.D. Cal. May 3, 2005)............. ix, 32

*Galdamez v. Potter,*
  415 F.3d 1015 (9th Cir. 2005) ..............................................................19

*Ghirmai v. Nw. Airlines, Inc.,*
  131 F. App'x 609 (9th Cir. 2005).........................................................34

*Harris v. Forklift Systems, Inc.,*
  510 U.S. 17 (1993)................................................................................18

*Hedberg v. Indiana Bell Tel. Co.,*
  47 F.3d 928 (7th Cir. 1995) ..................................................................22

Horton v. CCSF - CCSF MSJ                                    n:\labor\li2022\220258\01623450.docx
CASE NO. 3:22-cv-03174-WHO

*Hentzel v. Singer,*
    138 Cal.App.3d 290 ................................................................ ix, 32

*Hoppe v. Lewis Univ.,*
    692 F.3d 833 (7th Cir. 2012) ........................................................27

*Jensen v. Wells Fargo Bank,*
    85 Cal.App.4th 245 (2000) ..................................................... ix, 27

*Kelly v. Boeing Co.,*
    400 F.Supp.3d 1093 (D. Or. 2019) ..............................................33

*Lawson v. Umatilla County,*
    139 F.3d 690 (9th Cir. 1998) ...................................................20, 33

*Makor v. Burlington N. Santa Fe Ry. Co.,*
    680 F.App'x 542 (9th Cir. 2017).................................................26

*Mendoza v. Regents of University of California,*
    78 Cal.App.3d 168 (1978) ..................................................... viii, 20

*Morgan v. Regents of Univ. of Cal.,*
    88 Cal. App. 4th 52, (2000) ........................................................34

*Myers v. Hose,*
    50 F.3d 278 (4th Cir. 1995) .........................................................26

*Park v. Howard Univ.,*
    71 F.3d 904 (D.C. Cir. 1995) .......................................................17

*Powley v. Rail Crew Express LLC,*
    25 F.4th 610 (2022) ...................................................................22

*Price v. Victor Valley Union High Sch. Dist.,*
    85 Cal. App. 5th 231 (2022) ........................................................24

*Ray v. Henderson,*
    217 F.3d 1234 (9th Cir. 2000) ................................................. ix, 33

*Reynaga v. Roseburg Forest Products,*
    847 F.3d 678  (9th Cir. 2017) .......................................................18

*Ruiz v. RSCR California, Inc.,*
    683 F.Supp.3d 1079 C.D. Cal. 2023)...........................................33

*Samper v. Providence St. Vincent Med. Ctr.,*
    675 F.3d 1233 (9th Cir. 2012) ................................................. ix, 25

Horton v. CCSF - CCSF MSJ                                    n:\labor\li2022\220258\01623450.docx
CASE NO. 3:22-cv-03174-WHO

*Schmidt v. Safeway, Inc.*,
   864 F.Supp. 991 (1994) ............................................................................................22

*Scotch v. Art Inst. of Cal.*,
   173 Cal.App.4th 986 (2009). ................................................................ ix, 23, 30, 35

*Snead v. Metro. Prop. & Cas. Ins. Co.*,
   237 F.3d 1080 (9th Cir. 2001) ..................................................................................22

*Steffes v. Stepan*,
   144 F.3d 1070 (7th Cir. 1998) .......................................................................... ix, 27

*Swinton v. Potomac Corp.*,
   270 F.3d 794 (9th Cir. 2001) ....................................................................................19

*Taylor v. Principal Fin. Grp.*, Inc.,
   93 F.3d 155 (5th Cir. 1996) ................................................................................22, 23

*U.S. E.E.O.C. v. UPS Supply Chain Sols.*,
   620 F.3d 1103 (9th Cir. 2010) ..................................................................................30

*United Transp. Union*,
   889 F.3d 1088 (9th Cir. 2018) ......................................................................... ix, 21

*Villiarimo v. Aloha Island Air, Inc.*,
   281 F.3d 1054 (9th Cir. 2002) ..................................................................................34

*Walker v. City of Berkeley*,
   951 F.2d 182 (9th Cir.1991) .....................................................................................21

*Wood v. Green*,
   323 F.3d 1309 (11th Cir. 2003) ................................................................................26

*Yartzoff v. Thomas*,
   809 F.2d 1371, 1375 (9th Cir. 1987) ........................................................................33

*Zivkovic v. S. Cal. Edison Co.*,
   302 F.3d 1080 (9th Cir. 2002) ..................................................................................27

*Zografos v. City and County of San Francisco*,
   No. C 05-3881 PJHm 2006 WL 3699552,  (N.D. Cal., Dec. 13, 2006.) ....................21

**Statutes**
42 U.S.C. § 200 .............................................................................................................17

**Rules**
Fed. R. Civ. P. 56(a) ............................................................................................ viii, 16

1

Federal Rule of Civil Procedure 54(d)...........................................................................................35

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Horton v. CCSF - CCSF MSJ
CASE NO. 3:22-cv-03174-WHO

n:\labor\li2022\220258\01623450.docx

### NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE THAT on October 16, 2024 at 2:00 p.m., City and County of San Francisco (the "City") and San Francisco Public Utilities Commission ("SFPUC") (collectively, "Defendants") will and hereby do move this court, located in Courtroom 2, 17th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102, for an order granting summary judgment as to each and every claim asserted by Pro Se Plaintiff Cory Horton ("Horton") pursuant to Federal Rule of Civil Procedure 56. Pursuant to the Court's standing order, this hearing will take place via Zoom:

- https://canduscourts.zoomgov.com/j/1617174922?pwd=SG9zZm1udUxlVEhtUUNHNmVGeXJ4UT09
- Meeting ID: 161 717 4922
- Password: 687019

This Motion is made on the following grounds:

**Claim No. 1**: Horton's claim for racial harassment in violation of Title VII of the 1964 Civil Rights Act ("Title VII") claim fails because Horton failed to exhaust administrative remedies. *B.K.B. v. Maui Police Dept.*, 276 F.3d 1091, 1099 (9th Cir. 2002). The claim fails for the additional reasons that: Horton admits that the assault and alleged stalking were not racially motivated; the remaining alleged incidents of harassment were carried out by third parties outside of work and therefore do not constitute severe and pervasive racial harassment; and Horton failed to properly report the alleged harassment.

**Claim No. 9**: Horton's *Skelly* claim fails because he was a non-permanent employee and therefore did not have a vested property interest in his continued employment, *Mendoza v. Regents of University of California*, 78 Cal.App.3d 168, 173 (1978), and because Horton waived his right to challenge any irregularities in a pre-deprivation by declining to challenge his termination through a post-termination hearing.

**Claim Nos. 3-5, 11-12**: Horton's claims for disability discrimination in violation of the Americans with Disabilities Act ("ADA") and the California Fair Employment and Housing Act ("FEHA") fail for the following reasons. First, the undisputed evidence shows Horton failed to disclose he had a disability prior to February 2021. *See United Transp. Union*, 889 F.3d 1088, 1095

viii

(9th Cir. 2018), CACI 2541, CACI 2546. Second, as to the period after February 2021, the undisputed evidence shows that Horton could not perform the essential functions of his job or a vacant City job with or without reasonable accommodation. *See Bates v. United Parcel Serv.*, *Inc.*, 511 F.3d 974, 990 (9th Cir. 2007); *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012); CAC 2541. Third, as to the period after February 2021, the undisputed evidence shows that Defendants made good faith efforts to participate in the interactive process, while Horton refused to engage in the interactive process. See *Jensen v. Wells Fargo Bank*, 85 Cal.App.4th 245, 262–63 (2000); *Steffes v. Stepan*, 144 F.3d 1070, 1073 (7th Cir. 1998).

**Claim No. 17**: Horton's seventeenth cause of action for retaliation in violation of Labor Code § 6311 claim fails because (1) Horton cannot prove causation; (2) Horton cannot show that he refused to work due to safety concerns, as opposed to his professed medical issues, *see Caldwell v. OS Rest. Servs.*, LLC, CV 19-00754 DMG (MRWx), 2021 WL 3264306, at \*8 (C.D. Cal. May 13, 2021); and (3) Horton has no evidence his workplace was unsafe at the time he refused to return to work. *See Hentzel v. Singer*, 138 Cal.App.3d 290, 299-300; *Frazier v. United Parcel Serv., Inc*., No. 1:02CV6509OWWDLB, 2005 WL 1335245, at \*12 (E.D. Cal. May 3, 2005).

**Claim Nos. 2, 6: 13, 15**: Cause of action nos. 2, 6, 13, and 15 for retaliation in violation of Title VII, the ADA, FEHA, and California Labor Code § 1102.5 fail because the undisputed evidence shows there is no causal connection between a protected activity (e.g., requesting accommodations or opposing alleged unlawful practices) and an adverse employment action. *See Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000) (Title VII); *Brown v. City of Tucson*, 336 F.3d 1181, 1187 (9th Cir. 2003) (ADA); CACI 2505 (FEHA); CACI 4603 (§ 1102.5).

**Claim No. 14**: Horton's Claim for Failure to Prevent Discrimination and Harassment in violation of FEHA fails because Horton cannot prove any underlying discrimination or harassment occurred. *See Scotch v. Art Inst. of Cal.*, 173 Cal.App.4th 986, 1021 (2009).

This motion is based on the on the accompanying Memorandum of Points and Authorities[1]; the concurrently filed declarations of Adam M. Shapiro ("Shapiro Decl."), Maria Mabutas ("Mabutas

---

[1] The Court granted Defendants leave to file a 35-page brief. Dkt No. 106.

Horton v. CCSF - CCSF MSJ
CASE NO. 3:22-cv-03174-WHO

n:\labor\li2022\220258\01623450.docx

Decl."), Rachel Gardunio ("Gardunio Decl."), Silvia Recinos ("Recinos Decl."), Michael Ho ("Ho

Decl."), and Amanda Higgins ("Higgins Decl."); all of the pleadings and other documentation

previously filed in this case; and the argument of counsel at the hearing.


Dated:  September 6, 2024

        DAVID CHIU
        City Attorney
        ROSE DARLING
        Chief Labor Attorney
        ADAM SHAPIRO
        Deputy City Attorney


      By: *Adam Shapiro*
        ADAM SHAPIRO

        Attorneys for Defendants City
        and County of San Francisco, San Francisco
        Public Utilities Commission

x

Horton v. CCSF - CCSF MSJ
CASE NO. 3:22-cv-03174-WHO           n:\labor\li2022\220258\01623450.docx

1

2

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

3      This case arises from Defendants' good faith attempts to engage Horton in an interactive

4  process to identify a reasonable accommodation for his alleged disability that would have allowed him

5  to return to work, either at his former position or a vacant City position for which he was qualified;

6  Horton's stubborn refusal to participate in that interactive process; and Horton's subsequent attempts

7  to blame Defendants for the consequences of his own intransigence. Viewing the evidence in the light

8  most favorable to Horton, summary judgment is appropriate.

9      The undisputed evidence will show the following: Starting in December 2019, Horton worked

10  as a stationary engineer at SFPUC Headquarters at 525 Golden Gate Avenue, San Francisco ("525

11  Golden Gate"), where he performed onsite maintenance and repair work on the building's HVAC

12  system. (Mabutas Decl. ¶ 3.) Horton was never a permanent employee. (Gardunio Decl. ¶¶ 2-5.)

13      On August 12, 2020, Horton exited the Civic Center BART station on his way to work and

14  purportedly took pictures of a few individuals he believed to be engaged in drug dealing in an effort to

15  disrupt their operations. (Shapiro Decl. Ex. 9.) The individuals then assaulted Horton. (*Id.* Ex. 1

16  439:11-444:10.) Following the assault, Horton's supervisors, Al Larcina and Maria Mabutas, offered

17  Horton various accommodations to improve the safety of Horton's commute, including allowing him

18  to change schedules and offering Horton a pass for the Civic Center parking garage. (Mabutas Decl. ¶¶

19  12-29.) Horton thanked Mabutas for her efforts to accommodate him. (Mabutas Decl. Exs. 6-7.)

20      In December 2020, Horton had a child and was granted Family Medical Leave Act ("FMLA")

21  through March 2021. (Mabutas Decl. ¶¶ 30-31.)

22      In February 2021, Horton submitted a worker's compensation claim for the August 12 assault.

23  (Shapiro Decl. Ex. 36.) Later in February, Horton was informed that his worker's compensation claim

24  was being denied because the assault occurred outside of work. (Recinos Decl. Ex. 2.) Horton then

25  submitted new worker's compensation claim forms to his supervisors, alleging he had been stalked *at*

26  *work* sometime after the August 12 assault and before he went on leave in December. (Shapiro Ex.

27  37.) This was the first time he reported these allegations to his supervisors. (Mabutas Decl. ¶¶ 35-38.)

28

Horton v. CCSF - CCSF MSJ
CASE NO. 3:22-cv-03174-WHO

n:\labor\li2022\220258\01623450.docx

Also in February 2021, Horton claimed, for the first time, that he had a disability and that he needed to work remotely 100 percent of the time as a reasonable accommodation, notwithstanding that he was responsible for repairing and maintaining equipment onsite. (Shapiro Decl. Exs. 13-15.) Horton was referred to SFPUC's EEO staff, including Rick Nelson and then Dena Narbaitz. Nelson and Narbaitz attempted to engage Horton in the interactive process, repeatedly urging Horton to submit a note from his doctor specifying work restrictions that could be accommodated and allow him to return to work, either at his old position or a vacant one. (*Id.* Exs. 5, 16-17, 26, 28, 32, 35, 40, 42-43.) Instead, Horton submitted a series of notes from his medical provider stating Horton was unable to return to work altogether. (*Id.* Exs. 19, 21, 23, 30.) Horton also repeatedly represented he was unable to work at all, and refused to consider other accommodations. (*See, e.g., id.* Exs. 25, 29, 32, 34.)

When Horton said he could not work, Defendants took him at his word, and granted Horton leave as a reasonable accommodation between March 2021 and November 2021. (Shapiro Decl. Exs. 20, 22, 24, 31, 35.) At the same time, Defendants continued to ask Horton to provide medical documentation of work restrictions showing he could return to work, either at his former position or at another vacant City position, with or without accommodation (*id.* Exs. 5, 16-17, 26, 28, 32, 35, 40, 42-43). Horton refused to respond, other than to submit more medical notes stating he could not return to work. (*Id.* Exs. 21, 23, 30.) When Nelson and Narbaitz cautioned Horton that indefinite leave was not a reasonable accommodation and that he might be medically separated if he could not return to work with or without accommodation, Horton berated them. (*Id.* Exs. 5, 25, 39, 41, 42, 45, 47.)

The City medically separated Horton in November 2021. (Shapiro Decl. Ex. 48.) At that point Horton had been on leave for a year, he had repeatedly represented he could not return to work, he declined to state when or under what conditions he could return to work, and he had declined requests to provide medical documentation stating something other than he was unable to work.

Horton's claims are amenable to summary judgment. **<u>First</u>**, Horton's racial harassment claim fails because, among things, he failed to exhaust administrative remedies. **<u>Second</u>**, Horton's *Skelly* claim fails because, inter alia, he was a probationary employee and therefore did not have a vested property interest in his continued employment. **<u>Third</u>**, Horton's disability discrimination claims fail

because the undisputed evidence shows Horton did not disclose his alleged disability until February 2021, because Horton could not perform the essential functions of his job or any other job with or without accommodation, and because the City made good faith efforts to engage Horton in the interactive process but Horton refused to participate. **Fourth**, Horton's Cal. Labor Code § 6311 claim fails because, among other things, he cannot prove causation and Horton cannot show that he refused to work due to safety concerns. **Fifth**, Horton's other retaliation claims fail because Horton cannot establish causation. **Sixth**, Horton's failure-to-prevent discrimination and harassment claims fail because Horton cannot establish an underlying claim for discrimination or harassment.

## FACTUAL BACKGROUND

I.   **Horton's Employment With the City Was Brief, And He Never Became A Permanent Employee.**

Starting in December 2019, Horton worked for the SFPUC as a 7334 Stationary Engineer at 525 Golden Gate. (Shapiro Decl. ¶ 2, Ex. 1  at 29:8-17.) Horton's initial position with SFPUC was Temporary Provisional ("TPV"). (Gardunio Decl. ¶ 2, Ex. 1). As such, Horton's employment was at will, and he served at the discretion of the SFPUC General Manager. (*Id.* ¶ 2.)

In late November 2020, SFPUC offered to hire Horton into a Permanent Civil Service ("PCS") position as a 7334 Stationary Engineer. (Shapiro Decl. Ex. 6; Gardunio Decl. ¶ 3.) Horton's PCS appointment started on December 12, 2020. (Shapiro Decl. Ex. 6.) As explained in the notice signed by Horton in December 2020, Horton needed to serve a 2080-hour probationary period to evaluate his performance on the job. (Shapiro Decl. Ex. 7; Gardunio Decl. ¶ 3.) SFPUC had the authority to release Horton at any time during this probationary period, with or without cause. (Gardunio Decl. ¶ 3)

Horton went out on leave in December 2020, almost immediately after his probationary period commenced, and remained on leave until November 30, 2021, when he was medically separated. During this period, Horton did not earn any time that could be credited towards his probationary period. (Gardunio Decl. ¶ 4.) Accordingly, Horton remained a probationary employee at the time he was medically separated in November 2021. (*Id.*)

## II.   SFPUC Needed Horton To Work Onsite, But Allowed Him To Take Training Courses From Home A Few Days Per Week For A Brief Period Early In The Pandemic.

As a stationary engineer at 525 Golden Gate, Horton was responsible for operating, maintaining, inspecting, and repairing pumping, heating, ventilating, air conditioning, refrigeration, and power generating equipment in the building. (Mabutas Decl. ¶ 3; Shapiro Decl. Ex. 8 ¶ 7). It was not possible for Horton to work remotely, because almost all of his duties as a stationary engineer required him to be onsite. (Mabutas Decl. ¶ 4; Shapiro Decl. Ex. 4 at 10:7-11:1, 12:6-16, 20:3-6.)

Horton "[c]ompleted building inspections daily." (Shapiro Decl. Ex. 8  ¶ 7; Shapiro Decl. Ex. 1 at 319:10-15.) These building inspections, also known as "daily rounds," needed to be performed onsite, and included physically inspecting the building's water pumps, back-up generator, water heater, boiler, chiller plant, cooling tower, and various equipment in the building's computer server room. (*Id.* Ex. 4 at 13:11-19:14.) Horton also performed other tasks that required him to be physically onsite, including preventative and emergency maintenance, repairs, and painting. (Shapiro Decl. Ex. 4 at 20:7-21:21.)

In March 2020, to reduce the spread of COVID-19, stationary engineers worked onsite two to three days per week, and at home for the remainder. (Mabutas Decl. ¶ 9.; Shapiro Decl. Ex. 1 at 47:7-13.) Stationary engineers, including Horton, could not perform inspections, repairs, or maintenance of equipment while they worked from home. (Mabutas Decl. ¶ 10). Because of the lack of work available to stationary engineers who were not present onsite, SFPUC directed the stationary engineers at 525 Golden Gate to take various online training courses while working from home. (*Id.*) Horton conceded that, during the pandemic, there was always a stationary engineer stationed onsite "manning the building." (*Id.* at 47:14-19.)

The practice of allowing stationary engineers to take training courses from home was sustainable for only a short time. (Mabutas Decl. ¶ 10.) In August 2020, SFPUC directed all stationary engineers at 525 Golden Gate to return to work onsite five days a week. (*Id.* ¶ 11.)

## III.   August 2020: Horton Is Assaulted, SFPUC Offers Horton Various Safety Accommodations, And Horton Thanks His Managers For Their Response.

On Wednesday, August 12, 2020, Horton was assaulted while exiting the Civic Center BART

station on his way to 525 Golden Gate. (Shapiro Decl. Ex. 1 at 439:11-444:10.) Horton's assailants chased him but never touched him. (*Id.*) Horton told the Sheriff's Department that, prior to the assault, he was taking pictures of his assailants "to report them to the Police for suspected drug dealing." (Shapiro Decl. Ex. 9 at CCSF 00330.)[2] Horton cannot recall his assailants doing or saying anything that would lead him to believe that the assault had anything to do with his race or his alleged disability. (*Id.* at 125:3-12.) Horton's colleagues, including Horton's manager, Al Larcina, went to the scene of assault and escorted him back to 525 Golden Gate. (*Id.* Ex. 4 at 30:14-21.) Horton took off the rest of August 12, as well as August 13 and 14. (*Id.* at 33:7-21.)

On August 12, 2020, before Horton requested any kind of accommodation, Larcina talked with Facilities Director Maria Mabutas, and requested Mabutas provide Horton with parking at 525 Golden Gate. (Shapiro Decl. Ex. 4 at 36:4-15; Mabutas Decl. ¶ 13, Ex. 2.) Mabutas secured parking passes in the Civic Center parking garage for all four members of the building crew later in the month, as she was concerned about everyone's safety. (Mabutas Decl. ¶¶ 12-17 & Exs. 1-3.) Larcina testified that he subsequently offered Horton the parking pass but Horton rejected it, saying "he didn't want to drive into work." (Shapiro Decl. Ex. 4 at 37:4-21.) Horton testified that he was offered the parking pass and that he expressed to the City that he thought driving to work would be an enormous expense. (*Id.* Ex. 1 at 278:11-279:3, 292:25-293:5.) At the same time, Horton complained: "I never got a parking pass." (*Id.* at 108:15-111:13.) At deposition, Horton refused to provide a coherent answer about whether or why he turned down the pass. (*See id.*) While Horton suggested that there was a "misunderstanding" about the pass, he evaded questions about what actually happened. (*See id.*) In a February 23, 2021 email to Mabutas, Horton stated that "parking passes were issued out before I had the ability to accept" and that he was "under the impression more passes were going to be issued of which never happened." (Mabutas Decl. Ex. 8.)

On August 13, Larcina emailed Horton with information concerning the City's Employee Assistance Program ("EAP"), a mental health and counseling program offered for City employees, as

---

[2] Horton's own sworn incident report statement confirms that Horton was taking pictures prior to the assault. (Shapiro Decl. Ex. 10 at p. 1.) However, at deposition, Horton claimed his sworn statement was false and that he was not taking any pictures that day. (*Id.* Ex. 1 at 56:21-57:22.)

well as workers' compensation claim forms and information concerning the City's medical provider network. (Shapiro Decl. ¶ 12, Ex. 11). Additionally, later in August, Larcina switched shifts with Horton so that Horton could catch the ferry to work and change his route to 525 Golden Gate. (Shapiro Decl. Ex. 4 at 40:11-41:6; *id.* Ex. 1 at 107:23-108:3.)

On August 17, upon his return to work, Horton sent an email to Mabutas entitled "assault accommodations." (Mabutas Decl. ¶ 20 & Ex. 4; Shapiro Decl. Ex. 1 at 105:2-7.) In that email, Horton documented the August 12 assault and stated: "I and my family would like to know what options are available for myself regarding commuting accommodations, safety accommodations, and further security." (Mabutas Decl. Ex. 4.) Nowhere in that email did Horton disclose that he had a disability or request a specific accommodation. (*See id.*)

Mabutas responded to Horton's email later that same day, acknowledging that "this is a very serious situation," encouraging Horton to reach out to EAP, and stating that she was "discussing the possibility of available parking at Civic Center garage." (Mabutas Decl. ¶ 21, Ex. 5.) On August 18, Horton responded to Mabutas stating: "Thank you very much for your expedient response to this matter, it means a lot to know you all understand and are doing something." (*Id.* ¶ 22 & Ex. 6.) On August 21, Mabutas met with Horton and explained that SFPUC offered a service whereby community ambassadors escorted groups of SFPUC employees to and from the Civic Center BART station. (*Id.* ¶ 23.) Later that day, Mabutas emailed Horton additional information concerning the community ambassador program. (*Id.* ¶ 24, Ex. 7). Horton responded via email: "Thanks for the information and following up on my concerns, means a lot!" (Mabutas Decl. Ex. 7; Shapiro Ex. 1 at 116:22-117:24.)

The emails described above constitute the only written correspondence between August through December 2020 to or from Horton concerning his request for "assault accommodations." (Shapiro Decl. ¶ 13). Nowhere in any of that correspondence did Horton claim to have a disability or otherwise complain that the City had failed to provide him with adequate accommodations. (*Id.* Ex. 11, Mabutas Decl. Exs 4-7). Horton also does not have any recollection of having any verbal conversations with Mabutas about accommodations. (*Id.* at 105:2-24; 114:18-115:1.) Horton testified that "it's possible" he had verbal conversations with Larcina about accommodations, but he has no

recollection of what was said. (Shapiro Decl. Ex. 1 at 120:5-15, 298:16-299:15.)

**IV.    Unidentified Persons Allegedly Yell Racial Epithets At Horton On The Street Outside of 525 Golden Gate; Horton Declines To Report The Two Incidents To His Supervisors.**

Horton claims that on two occasions, unidentified members of the public, who were not City employees, yelled racial slurs at him outside of 525 Golden Gate. (Shapiro Decl. Ex. 1 at 292:14-24; *id.* Ex. 2 at 8:21-9:8, *id.* Ex. 3.) Horton cannot recall if these events occurred before or after the August 12 assault, he does not know who yelled the slurs, and he didn't report the incidents to his supervisors.

First, Horton claimed that he was "doing a repair on the exterior windows and an unknown older white man walked up to him and loudly screamed 'you fuckin N-word.'" (Shapiro Decl. ¶ 3, Ex. 2 at 8:24-9:2.) Horton claims that two sheriffs witnessed the incident and instructed the man to leave. (*Id.*) Horton did not report this incident to his supervisors or SFPUC's Equal Employment Opportunity ("EEO") program. (*Id.*; Shapiro Decl. Ex. 1 at 100:7-10, 103:11-21, 287:4-20). Horton had never seen this individual before and he never saw him again. (*Id.* Ex. 1 at 99:20-24.)

Second, Horton claims that on another occasion "a young Hispanic man" yelled "murder the monkey" in his presence. (Shapiro Decl. Ex. 2 at 9:3-6; Ex. 1 at 124:12-16, 292:1-5.) Horton cannot recall when this incident occurred, or whether it occurred before or after the August 12 assault. (*Id.* Ex. 2 at 9:3-6; Ex. 1 at 102:9-16.) At deposition Horton could not recall whether he reported the incident to any of his supervisors. (*Id.* Ex. 1 at 102:9-103:21.) Horton later testified he reported the incident to security and *assumed* security must have apprised his supervisors of the incident. (*Id.* at 288:15-291:11.) When pressed on the basis for this assumption, Horton testified: "So maybe they did; maybe they didn't. I don't have any kind of information on that." (*Id.* at 291:1-13.)

Per SFPUC protocol, when security incidents are reported, the reports are maintained in SFPUC's incident report database. (Higgins Decl. ¶ 5.) Neither the alleged "n-word" or "monkey" incidents appears in the database. (*Id.* ¶ 4.) Moreover, the City's written anti-harassment policy, which Horton acknowledged receiving upon hire, states that employees who wish to report harassment should contact their supervisor or EEO personnel, not security. (Ho Decl. ¶¶ 7-8, Exs. 4-5.) Security personnel at 525 Golden Gate are sheriffs' deputies. (Gardunio Decl. ¶ 7.) Non-supervisory personnel are not required to report complaints of discrimination or harassment. (Gardunio Decl. ¶ 7.)

**V.      December 2020: Horton Unexpectedly Goes Out On Paternity Leave**

On December 8, Horton unexpectedly requested a 4-month paternity leave from December 14, 2020 to April 10, 2021. (Mabutas Decl. ¶ 30-31.) Horton was ultimately granted FMLA/child bonding leave for the period between December 10, 2020 through March 3, 2021. (Shapiro Decl. ¶ 14, Ex. 12.)

**VI.     February 2021: For The First Time, Horton Tells His Supervisors He Was Stalked Between August and December 2020.**

On February 10, 2021, Horton submitted a worker's compensation claim form in connection with the August 12 assault.[3] (Shapiro Decl. ¶ 38, Ex. 36; Recinos Decl. ¶ 2, Ex. 1.) On February 16, 2021, Horton was informed that his claim was being denied because the alleged injury occurred outside of work. (Recinos Decl. ¶ 3, Ex. 2.) Five days later, on February 21, Horton submitted additional claim forms to his supervisors, asserting that his assailants stalked him *at work* between August 18 and December 3, 2020. (Shapiro Decl. ¶ 39, Ex. 37.) This is the first time Horton documented this alleged subsequent stalking or reported the stalking to his supervisors.[4] (Mabutas Decl. ¶¶ 35-38; Shapiro Decl. Ex. 4 at 49:15-53:7.) When asked why he did not mention this alleged stalking in his February 10 claim, Horton initially refused to answer, and then stated: "there's no rule that you have to submit one form for your claim." (Shapiro Decl. Ex. 1 at 143:8-152:4.)

Horton testified he could not recall a single detail concerning the alleged incidents of stalking, threats, intimidation, and harassment that allegedly occurred after the August 12 assault. (*Id.* at 91:25-93:23.) Nor could Horton recall how many times he reencountered his assailants. (*Id.* at 91:25-93:23.) The alleged stalkers did not say or do anything to suggest that they were harassing Horton based on his race or his alleged disability. (*Id.* at 125:13-22.)

Horton did not tell his supervisors about the alleged stalking at the time it allegedly occurred, between August and December 2020. (Shapiro Decl. Ex. 1 at 103:22-104:7, 283:11-13; *id.* Ex. 4 at 46:14-47:6; 50:16-51:12; Mabutas Decl. ¶ 38.) Horton testified that, at the time the alleged stalking

---

[3] Horton testified the August 13 date on the form was incorrect and he meant to reference the August 12, 2020 assault. (Shapiro Decl. Ex. 1 at 130:23-133:23.)

[4] Horton claims that he first documented the alleged stalking in an August 12, 2020 report to the San Francisco Sheriff's Department and in a December 1, 2020 criminal protective order issued by San Francisco Superior Court. (Shapiro Decl. Ex. 1 at 496:4-504:16.) However, the Sheriffs' report concerns the August 12 assault and predates any alleged stalking. (Shapiro Dec. Exs. 9-10.) Likewise, the criminal protective order saying nothing about any stalking. (*Id.* ¶ 40, Ex. 38.))

occurred, he followed his union's alleged protocol and verbally reported the alleged stalking to "security." (Shapiro Decl. Ex. 1 at 103:22-104:7, 283:14-284:5.) The collective bargaining agreement between Horton's former union and the City does not contain any such protocol. (Ho Decl. ¶¶ 3-4, Ex.1.) Moreover, the SFPUC and City handbooks, which Horton acknowledged receiving when he was first hired, direct employees to immediately report acts and threats of violence to their supervisor. (*Id.* ¶¶ 5, 6, 8, *id.* Ex. 2 at CCSF_5177, Ex. 3 at CCSF_05100, Ex. 5.) There is no record of Horton reporting the alleged stalking to security, as the incidents do not appear in SFPUC's database. (Higgins Decl. ¶¶ 3-4.)

**VII.    February 2021: For The First Time, Horton Complains To His Supervisors About Their Response To The August 12 Assault.**

On February 23 and 24, 2021, after Horton's workers' compensation claim was denied, Horton complained to Mabutas and Larcina that they had failed to provide him with accommodations following the August 12 assault. This was the first time he had lodged such complaints.

On February 23, Horton emailed Mabutas, stating he had requested "an accommodation last year for transportation" and "[t]he support was not there to help." (Mabutas Decl. ¶¶ 37-38, Ex. 8.) Mabutas responded, stating Horton had been offered a change of schedule and a parking accommodation, and that he had declined the latter. (*Id.*) Horton replied that the passes were issued "before I had the ability to accept." (*Id.* Ex. 8.) In a subsequent email to Mabutas, Horton stated: "Please don't allow discriminatory objectives to impede with me getting help [sic] . . . ." (*Id.*) This was the first time Horton reported such complaints to Mabutas. (*Id.* ¶¶ 36-40.)

Horton called Al Larcina the following day, February 24. (Shapiro Decl. Ex. 4 at 50:16-19.) During this call, Horton complained to Larcina, for the first time, that he had not received a parking pass before he went out on leave. (*Id.* at 53:8-17.)

**VIII.   February 2021: For The First Time, Horton Seeks Medical Attention And Requests A Reasonable Accommodation For An Alleged Disability.**

After Horton went out on leave in December 2020, he saw a medical professional for the first time in connection with the August 12 assault, and was purportedly diagnosed with "trauma." (Shapiro Decl. Ex. 1 at 294:11-295:22; *see also id.* at 78:12-79:3.) On February 21, 2021, the same day Horton

submitted his claim forms concerning alleged stalking, Horton emailed Mabutas stating: "I didn't realize I was suffering from trauma until having time to process these events and take preliminary tests." (*Id.* ¶ 15, Ex. 13.) Later that same day, Horton asked for an "ADA" accommodation; Rick Nelson (an SFPUC EEO Programs Manager) sent Horton a reasonable accommodation request packet; and Horton filled out the forms and returned them to Nelson. (*Id.* ¶¶ 16-17, Exs. 14-15.) In these forms, Horton stated "I'm requesting a job that allows telecommuting 100%." (*Id.* ¶ 17, Ex. 15 at PLT 00281.)

### IX. February To April 2021: Nelson Asks Horton For Documentation of Specific Work Restrictions And Repeatedly Extends Horton's Leave After Horton Submits Three Medical Notes From Girton Stating Horton Is Unable to Work.

On February 22, 2021, Horton emailed Nelson notes from his medical providers, both of which predated Horton's employment with the City. (Shapiro Decl. ¶ 18, Ex. 16). One note from October 2019 stated: "Being moved to a less stressful position will be beneficial for [Horton's] medical condition." (*Id.* Ex. 16 at pg. 2.) The other note, from 2016, represented that Horton had been diagnosed with "major depressive disorder moderate." (*Id.* at pg. 3.) Later that day, Nelson emailed Horton, stating the notes were "too vague for me to rely on in analyzing potential accommodations, since all jobs come with a certain level of stress." (*Id.* ¶ 19, Ex. 17.) Horton expressed confusion and Nelson immediately responded: "I need you to provide a note from your healthcare provider that lays out what your reasonable restrictions actually are. Something that says that due to your disability you are unable to do [X], and how long that condition is expected to last." (*Id.)*

On or around March 13, 2021, Nelson received a letter from Jeryl Girton, NP, Horton's medical provider, stating "Mr. Cory Horton is unable to attend work and carry out his regular job duties at this time. . . . His current estimated return to work status date is April 12, 2021." (*Id.* ¶ 21, Ex. 19.) On March 15, 2021, Nelson extended Horton's leave to April 12 as a temporary reasonable accommodation. (*Id.* ¶ 22, Ex. 20.) Because Girton's note had placed Horton off of work, the only accommodation that Nelson could provide to Horton was leave. (Shapiro Decl. Ex. 5 at 55:5-9.)

Nelson subsequently had a phone call with Girton, where Girton said that she could send a note laying out Horton's work restrictions. (Shapiro Decl. Ex. 5 at 51:18-52:1.) Girton never provided a

note stating anything other than that Horton could not return to work. (*Id.* at 51:18-52:24.)

On April 6, 2021, Horton sent Nelson another letter from Girton, virtually identical to the one she had sent March 13. (Shapiro Decl. ¶ 23, Ex. 21.) Girton again stated that Horton was "unable to attend work and carry out his regular job duties at this time," and estimated that Horton could return to work on April 30, 2021. (*Id.* Ex. 21.) The following day, Nelson informed Horton that he would be extending his leave through April 30 as a "temporary accommodation." (*Id.* ¶ 24, Ex. 22).

On April 26, 2021, Girton sent Nelson a third letter on behalf of Horton. (Shapiro Decl. ¶ 25, Ex. 23.) As in her prior two letters, Girton did not describe any work restrictions that would have allowed Horton to return to work with or without accommodation. (*Id.* Ex. 23.) Instead, Girton once again stated that Horton "is unable to attend work and carry out his regular job duties at this time." (*Id.*) Girton estimated that Horton would be able to return to work on June 30, 2021. (*Id.*) The following day, April 27, Nelson informed Horton that his leave would extended through June 30 as a temporary accommodation. (*Id.* ¶ 26, Ex. 24.)

## X.  April 27 To May 10 2021: Horton Complains After Nelson Warns Horton He May Be Medically Separated If He Is Unable To Return To Work; Nelson Continues To Request Horton Provide More Specific Work Restrictions.

Nelson and Horton had a phone call on April 27. (Shapiro Decl. Ex. 1 at 206:2-12.) During that call, Nelson cautioned Horton that he may be medically separated if he remained on leave, and that Horton needed to provide more specific work restrictions before other accommodations could be considered. (Shapiro Decl. Ex. 5 at 66:5-67:16, 80:25-82:2.) Horton told Nelson that he was worried he might "blow someone's brains out" if he did return to work.[5] (*Id.* Ex. 1 at 206:13-20.) During the April 27 call, Nelson suggested Horton look into positions at other SFPUC locations, but Horton dismissed the idea. (*Id.* Ex. 5 at 68:1-70:6.)

On April 28, Horton emailed Nelson to complain about the call and the interactive process. (Shapiro Decl. ¶ 27, Ex. 25.) On May 5, Nelson responded, reiterating the need for Horton to provide medical documentation with specific work restrictions: "My role, as a reasonable accommodation

---

[5] Before he went out on leave, Horton carried a weapon to work. (Shapiro Decl. Ex. 1 at 206:24-209:11, 401:6-23.) Horton refused to state what kind of weapon, invoking his Fifth Amendment right against self-incrimination. (*Id.*)

coordinator, is to find ways that employees  . . . can eventually return to work. I was only asking for additional medical documentation because I'm trying to explore other potential accommodations with you." (Shapiro Decl. ¶ 28, Ex. 26.) Nelson also warned Horton that "leave can't be indefinite," and said that he only mentioned medical separation on the April 27 call "to be transparent about what would happen in the event we were unable to find a workable accommodation for you." (*Id.* Ex. 26.)

On May 10, 2021, Horton emailed Nelson, stating that, in February, he had applied for another position at SFPUC. (Shapiro Decl ¶ 29, Ex. 27.) The posting had expired in March, two months before Horton's email. (*Id.* at PLT 306.) Nelson responded later on May 10, explaining that Horton could not be placed in another City job at that time because Horton's medical provider had placed him "totally off work." (*Id.* ¶ 30, Ex. 28 at p. 1.) Nelson further explained:

> "That's part of why I was asking you to get more specific medical restrictions – not to force you back to work at 525GG[] as a building engineer, but first to see if there was anything we could do at 525 to fit within your work restrictions, and if not, to see if there are other positions that might within them. If we determined that a job search was the best thing for you based on your medical restrictions, then we'd certainly look at positions like the 5620, or any others you are qualified for or interested in.

(*Id.* Ex. 28 at p. 1.) Horton again declined to respond to Nelson's request for further information regarding his medical restrictions. (*Id.* Ex. 5 at 87:9-17.) Horton testified that, at that time, Girton could not provide a note with additional restrictions, explaining: "I didn't have two months or a year treatment. I needed way more treatment than what you guys were going to allow. So within the time frame, you guys were kind of pushing me back to work earlier than my treatment had even gotten going." (*Id.* Ex. 1 at 227:2-228:22)

## XI.    June To July 2021: Horton Represents He Is Unable To Return To Work And Again Declines to Provide Specific Work Restrictions; Nelson Further Extends Horton's Leave.

On June 22, 2021, Nelson emailed Horton and asked if he had received any updates or changes to his medical restrictions. (Shapiro Decl. ¶ 31, Ex. 29 at pg. 2.) Horton responded: "I'm still in treatment and still out of work. If possible can my doctor send you a return to work release?" (*Id.* Ex. 29 at pp. 1-2.) Nelson replied and provided Horton with further information about security services offered by the Community Ambassadors program. (*Id.* at 1.)

On July 2, 2021, Horton sent Nelson a fourth note from Girton. (Shapiro Decl. ¶ 32, Ex. 30.)

Despite Nelson's repeated requests that Horton provide a note doing something other than place him off work, Girton's July 2 letter was virtually identical to her three prior ones. (*Id.* Ex. 30 at p. 2.) Again, Girton stated: "Cory Horton is unable to carry out his regular job duties at this time. . .  His current estimated return to work updated status is September 30, 2021." (*Id.*) Later on July 2, Nelson sent Horton a letter extending his leave through July 16 as a temporary accommodation to allow Horton time to provide an updated note from his medical provider. (*Id.* ¶ 33, Ex. 31.) Nelson testified that he did not extend Horton's leave further because "by this point , he had been on leave for quite some time, . . . [a]nd we needed to start moving towards something that would give us work restrictions." (*Id.* Ex. 5 at 96:3-21.)

On July 14, Nelson asked Horton to schedule a call "so we can discuss your latest doctor's note and explore some other ways we might be able to accommodate you." (Shapiro Decl. Ex. 32.) That same day, Nelson had another call with Horton, during which Nelson again discussed the need for medical documentation setting forth restrictions that would allow Horton to return to work. (Shapiro Decl. Ex. 5 at 98:7-99:16.) The following day, July 15, Horton sent Nelson an email stating: "I'm again not ok being pressured to return to work[,] especially given my current condition. I would appreciate it if I can have time to heal if not please stop threatening to discontinue my leave because it is hurtful." (*Id.* ¶ 34, Ex. 32.) On July 16, Nelson again extended Horton's leave, this time through August 17, 2021. (*Id.* ¶ 35, Ex. 33.)

## XII. August 2021: Narbaitz Provides Horton With A Final Leave Extension Through September And Offers Horton Various Options For Returning To Work; Horton Again Declines To Provide Specific Work Restrictions and Accuses Narbaitz Of Misconduct.

On August 11, 2021, EEO Programs Specialist Carmen Pearson emailed Horton asking if he would be requesting an extension of his leave, which was set to expire on August 17. (Shapiro Decl. Ex. 1 at 236:20-237:15; *id.* Ex. 34.) Horton responded: "I'm still under treatment and have not been released back to work . . . ." (*Id.* Ex. 34.)

On August 16, 2021, EEO Programs Specialist Dena Narbaitz sent Horton a letter extending his leave through September 29, 2021. (Shapiro Decl. ¶ 37; *id.* Ex. 35.) Narbaitz cautioned that this sixth extension would be Horton's last leave extension, and that he had three options going forward:

(1) return to work at 525 Golden Gate with or without accommodation; (2) if his healthcare was able to provide him with medical restrictions that did not enable him to work at 525 Golden Gate but possibly another location, SFPUC would refer Horton to a City-wide job search; or (3) Horton would be medically separated. (*Id.* Ex. 35 at CCSF-WC-002222-002223.) Narbatiz's letter notes that, as a stationary engineer, Horton was responsible for "opening and/or closing the building each day" which "require[d] him to check all building systems." (*Id.* at CCSF_WC-002222.) Horton cannot recall interacting with Narbaitz before receiving this letter. (*Id.* Ex. 1 at 239:5-24.)

Horton responded via email later on August 16, stating he found "a number of errors in your reply and untruthful statements regarding your accommodation letter" and threatened to hold Narbaitz "accountable" for those errors. (Shapiro Decl. ¶ 41, Ex. 39.) Horton also represented that he was still "under treatment and I have not been released by my doctor." (*Id.*)

Narbaitz replied to Horton on August 19, again providing him with reasonable accommodation paperwork and encouraging him to provide medical documentation of his work restrictions "so that the SFPUC can evaluate whether and how to accommodate the prescribed restrictions." (Shapiro Decl. ¶ 42, Ex. 40 at CCSF_02020.)

Horton responded to Narbaitz's advice by sending her two "warning" letters on August 19 and 20, asserting he was wrongly denied remote work (notwithstanding that Horton and Girton had repeatedly represented that Horton was unable to return to work at all) and accusing Narbaitz of violating his rights. (Shapiro Decl. ¶¶ 43-44, Exs. 41-42.) Narbaitz responded via email on August 20, stating: "[It] is crucial to your work that you . . . be onsite," but that if Horton's "healthcare provider can provide the SFPUC with medical restrictions that do more than simply place you 'off work,'" Horton would be eligible for a "Citywide job search for an alternate vacant/funded City position." (Shapiro Decl. ¶ 44, Ex. 42.) Narbaitz offered to schedule a call with Horton to walk him through the process. (*Id.*) There is no evidence Horton took Narbaitz up on her offer. (*Id.* Ex. 1 at 366:12-369:22.)

## XIII.   October to November 2021: SFPUC Medically Separates Horton After Horton Declines To State When Or Under What Circumstances He Can Return To Work.

On October 23, 2021, several weeks after Horton's approved leave expired, Narbaitz sent Horton a letter notifying him that SFPUC intended to medically separate him and setting a final

interactive process meeting for November 1, 2021 at 10:00 am. (Shapiro Decl. ¶ 45, Ex. 43.) Again, Narbaitz stated Horton could be placed in another position through a City-wide job search if his healthcare provider submitted restrictions that enabled him to work with accommodation. (*Id.* Ex. 43 at PLT 171.) Horton did not provide information from his healthcare provider and instead referred Narbaitz to his attorney. (*Id.* ¶ 46, Ex. 44.)

On November 1 at 9:54 a.m., a few minutes before the interactive process meeting was scheduled to start, Horton emailed Narbaitz, stating: "Please know I have filed DFEH and EEOC[6] complaints against you." (Shapiro Decl. ¶ 47, Ex. 45.) This is the first time Horton notified Narbaitz that he filed a complaint against her with DFEH and EEOC. (*Id.* Ex. 1 at 361:6-365:4.)

Around 10:00 a.m. on November 1, Horton and Narbaitz talked by phone. (Shapiro Ex. 1 at 365:18-24.) Horton cannot recall a single thing that was said during the November 1 call. (*Id.* at 369:23-370:4.) Horton believes he had one or more phone calls with Narbaitz prior to November 1. (*Id.* at 367:4-7.) The only thing Horton can recall about these earlier calls is that Narbaitz allegedly told Horton (1) he might be medically separated if he could not return to work and (2) SFPUC could not grant Horton telework as an accommodation "because whatever reasons." (*Id.* at 366:12-369:22.)

Immediately after the November 1 call, Horton sent Narbaitz two emails. In the first, Horton stated: "You have been extremely abusive and inconsiderate of rights." (Shapiro Decl. ¶ 48, Ex. 46.) In the second, Horton stated: "Please don't ever contact me again!!!" (*Id.* ¶ 49, Ex. 47.)

On November 30, 2021, SFPUC sent Horton a letter, signed by the SFPUC General Manager Dennis Herrera, stating that Horton had been medically separated. (Shapiro Decl. ¶ 50, Ex. 48.) The decision to medically separate Horton was made by Herrera, upon the advice of Rachel Gardunio, SFPUC's Deputy People Officer, and Ronald P. Flynn, SFPUC Deputy General Manager and Chief Operating Officer. (Gardunio Decl. ¶ 6.)

## XIV.   February 2022: Horton Files A Complaint For Discrimination and Retaliation With DFEH And EEOC.

Despite his prior statements to the City, Horton did not actually file a complaint with DFEH

---

[6] California Department of Fair Employment and Housing ("DFEH") (now the California Civil Rights Department), and the U.S. Equal Employment Opportunity Commission ("EEOC").

until February 4, 2022. (Shapiro Decl. ¶ 51, Ex. 49.) Horton alleged only that he was denied a reasonable accommodation due to disability and retaliated against for requesting a disability-related accommodation. (*Id.*) The DFEH complaint was dual filed with EEOC, and therefore the EEOC took no action on Horton's complaint. (*Id.* Ex. 1 at 357:7-359:2; Exs. 50-52.)

## PROCEDURAL HISTORY

Horton filed suit pro se on May 31, 2022, and filed an Amended Complaint on August 23, 2022. (Dkt. Nos. 1, 18.) The Court granted Defendants' motion to dismiss the Amended Complaint, and Horton filed a Second Amended Complaint on December 5, 2022. (Dkt Nos. 37, 38.) The Court granted in part and denied in part Defendants' motion to dismiss the 2AC, and then referred Horton to the Federal Pro Bono Project. (Dkt. Nos. 63, 64.) Following appointment of pro bono counsel, Horton filed a Third Amended Complaint ("3AC"), the operative pleading. (Dkt No. 82.) The Court granted in part the City's motion to dismiss the 3AC, dismissing Claim Nos. 7, 8, 10, and 16. (Dkt. No. 94.)

The remaining Defendants are SFPUC and the City. The remaining claims asserted by Horton are: (1) Title VII hostile work environment, (2) Title VII retaliation, (3) ADA disability discrimination, (4) ADA disparate treatment, (5) ADA failure to provide reasonable accommodation, (6) ADA retaliation, (9) violation of *Skelly*, (11) FEHA failure to provide reasonable accommodation, (12) FEHA failure to engage in the interactive process, (13) FEHA retaliation, (14) FEHA failure to prevent discrimination, (15) Labor Code § 1102.5 retaliation, and (17) Labor Code § 6311 retaliation. (Dkt. Nos. 82, 94.) Claim Nos. 7, 8, 10, and 16 have been dismissed. (Dkt. No. 94.)

## LEGAL STANDARD

Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).

///

1

**ARGUMENT**

2

**I.    Claim No. 1: Horton's Title VII Racial Harassment Claim Fails.**

3

       **A.    Horton Failed To Exhaust Administrative Remedies For His Harassment Claim.**

4

       As an initial matter, the Court should grant summary judgment on Horton's racial harassment

5

claim because he failed to exhaust administrative remedies as to that claim.

6

       "Under Title VII, a plaintiff must exhaust her administrative remedies by filing a timely charge

7

with the EEOC, or the appropriate state agency, thereby affording the agency an opportunity to

8

investigate the charge." *B.K.B. v. Maui Police Dept.*, 276 F.3d 1091, 1099 (9th Cir. 2002) (citing 42

9

U.S.C. § 200e-5(b)). "Allegations of discrimination not included in the plaintiff's administrative

10

charge "may not be considered by a federal court unless the new claims are like or reasonably related

11

to the allegations contained in the EEOC charge." *Id.* at 1100 (cleaned up). "In determining whether a

12

plaintiff has exhausted allegations that she did not specify in her administrative charge, it is

13

appropriate to consider such factors as the alleged basis of the discrimination, dates of discriminatory

14

acts specified within the charge, perpetrators of discrimination named in the charge, and any locations

15

at which discrimination is alleged to have occurred." *Id.*

16

       Here, Horton's DFEH complaint did not include any allegations of racial harassment. (*See*

17

Shapiro Decl. Ex. 49.) Rather, Horton's complaint only alleges he experienced disability

18

discrimination and that he was retaliated against for requesting a disability-related accommodation.

19

(*Id.*) Neither of these allegations are reasonably related to Horton's claims for racial harassment.

20

Moreover, while Horton's DFEH complaint pertains to actions by City employees between February

21

and December 2021 (*id.*), Horton's harassment claim is based on actions taken by third parties

22

between August and December 2020 (*id.* Shapiro Decl. Ex. 2 at 4:25-6:26). Accordingly, the Court

23

should grant summary judgment on the harassment claim based on failure to exhaust administrative

24

remedies. *See Park v. Howard Univ.*, 71 F.3d 904, 907-08 (D.C. Cir. 1995) (finding harassment claim

25

should be dismissed where EEOC charge "lacks any factual allegations supporting such a claim").

26

       **B.    Horton Concedes The Assault And Alleged Stalking Were Not Racially Motivated.**

27

       To make out a prima facie case for Title VII racial harassment, Horton must show, inter alia,

28

that he was subjected to verbal or physical conduct of a racial nature. *Reynaga v. Roseburg Forest Products*, 847 F.3d 678, 686 (9th Cir. 2017). Yet, Horton conceded he had no reason to believe the August 12 assault or the alleged stalking were motivated by his race. (Shapiro Decl. Ex. 2 at 4:25-6:14; *id.* Ex. 1 at 125:3-22.) In turn, Horton cannot establish a prima facie case of racial harassment based these events under Title VII.

### C. The "N-Word" and "Monkey" Incidents Were Perpetrated By Third Parties Outside The Workplace And Do Not Constitute Severe And Pervasive Harassment.

The only incidents of harassment alleged by Horton that appear to be racially motivated are the "monkey" incident and "N-word" incident. (Shapiro Decl. Ex. 2 at 6:15-26) These alleged incidents do not constitute severe and pervasive workplace harassment, as they occurred on the street, and were perpetrated by third parties. (*See* Factual Background § IV, *supra*.)

Title VII is violated "[w]hen the workplace is permeated with "discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (cleaned up.) "[M]ere utterance of an ... epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII. Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment— an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Id.* (cleaned up).

Here, the two incidents involving racial epithets did not alter the conditions of Horton's employment or create an abusive working environment in violation of Title VII. Both comments were made by strangers on the street outside of 525 Golden Gate. (*See* Shapiro Decl. Ex. 2 at 8:21-9:16.) Horton had never seen the perpetrators before and he never saw them again. (*Id.* Ex. 1 at 99:20-24.)

### D. Horton Cannot Establish A Title VII Third Party Harassment Claim Because He Failed To Properly Report the Alleged Harassment.

Horton's hostile work environment fails because he did not report the alleged harassment to his supervisors. "An employer may be held liable for the actionable third-party harassment of its employees," but only where the employer "ratifies or condones the conduct by failing to investigate

18

and remedy it after learning it." *Galdamez v. Potter*, 415 F.3d 1015, 1022 (9th Cir. 2005). As to

harassment by persons who are not supervisors, plaintiff must show that "management knew or should

have known of the harassment and failed to take reasonably prompt, corrective action." *Swinton v.*

*Potomac Corp.*, 270 F.3d 794, 803 (9th Cir. 2001) (cleaned up).

Here, Defendants could not have ratified third party conduct they were unaware of.  Horton's

supervisors did not know about the only two racially motivated incidents alleged by Horton -- the "n-

word" and "monkey" incidents. (Mabutas Decl. ¶ 36; Shapiro Decl. Ex. 4 at 46:14-47:13.) Indeed,

Horton admitted he did not report the incidents to his supervisors. (*Id*. at 100:7-103:21, 287:4-291:11.)

Nor did Horton's supervisors have any reason to know because Horton failed to properly report

the incidents. Horton claims he reported the two racial epithets to "security." (*See id.*) But security at

525 Golden Gate is comprised of Sheriff's deputies, who have no duty to report complaints of

discrimination or harassment. (Gardunio Decl. ¶ 7.) These law enforcement officials are charged with

maintaining the physical security of the building, and their job duties do not include responding to

complaints of Title VII violations. (*See id.*) In any event, SFPUC policies, which Horton

acknowledged receiving, expressly state that such incidents should be reported to a supervisor. (Ho

Decl. ¶¶ 5-8, Ex. 2 at CCSF_5177, Ex. 3 at CCSF_05100, Ex. 4, Ex. 5.) Horton testified he could only

speculate as to whether security would have communicated his reports to his supervisors. (Shapiro

Decl. Ex. 1 at 291:1-15.) In fact, SFPUC's security incident report database contains no record of a

report of Horton's alleged stalking, or the "n-word" or "monkey" incident. (Higgins Decl. ¶¶ 2-5.)

It is also noteworthy that, as part of the 9-month interactive process, Horton regularly spoke

with SFPUC EEO staff, who are specifically charged with responding to complaints of harassment.

Yet there is no evidence, Horton reported the racial epithet incidents to EEO during this period. (*See*

Background §§ VIII-XIII, *supra*.)  Even if Horton had properly reported the incidents, it is unclear

what remedial actions SFPUC could have taken. Horton had only one interaction with each of the

strangers who allegedly yelled the "n-word" and "monkey," and never saw them again. There was no

way for SFPUC to identify them or ensure they had no contact with Horton outside of work.

Accordingly, the Court should grant summary judgment on this claim because Horton did not

timely report these incidents and Horton therefore cannot establish that the City ratified third-party conduct.

## II. Claim No. 9: Horton Was Not Entitled To A *Skelly* Hearing Because He Was A Non-Permanent Employee, And Horton Waived Any Right He May Have Had To Challenge Pre-Termination Proceedings.

In his ninth cause of action, Horton alleges he was denied a fair and impartial pre-termination hearing in violation of *Skelly v. State Personnel Board*, 15 Cal.3d 194 (1975).[7] (Shapiro Decl. Ex. 8 ¶¶ 130-134.) This claim fails because the undisputed evidence shows that Horton was a non-permanent employee who did not have a property interest in his continued employment. Further, Horton waived his right to challenge any irregularities in the pre-termination hearing by declining to invoke his right to a post-termination hearing.

*Skelly* rights apply to "permanent" employees, since those employees have "a property interest in the continuation of [their] employment which is protected by due process." *Skelly*, 15 Cal.3d at 206. On the other hand, non-permanent employees "serve at the will of the employer and therefore do not possess any property interest in their continued employment." *Mendoza v. Regents of University of California*, 78 Cal.App.3d 168, 173 (1978). Such employees "possess no protected property rights and therefore are not entitled to due process before being terminated." *Lawson v. Umatilla County,* 139 F.3d 690, 692 (9th Cir. 1998).

Here, the undisputed evidence shows Horton was not a permanent employee when he was medically separated in November 2021. (*See* Factual Background § I, *supra*.) On December 11, 2020, Horton expressly acknowledged that he was serving 2080-hour probationary period, during which he could be released at any time with or without cause. (Shapiro Decl. Ex. 7; Gardunio Decl. ¶ 3.) Horton went out on leave immediately thereafter and never completed his probationary period. (Gardunio Decl. ¶ 4). Thus, Horton was an at-will employee at the time he was terminated, and did not have any due process rights associated with his employment.

Horton also waived his right to challenge the conduct of any pre-termination proceedings. The

---

[7] In Claim No. 9, Horton also alleges that Defendants violated Personnel Rule 52.3. The Court has held the source of this rule is "unclear," and that the claim itself is obviously stylized as a *Skelly* claim, and should be evaluated as such. *See* Dkt. No. 64 at p. 21; Dkt. No. 94 at 11.

Court has already held that the City's October 23, 2021 notice of intent to medically separate, along with the final interactive process call satisfied *Skelly*'s requirements concerning notice and an opportunity to respond. (Dkt. No. 64; Shapiro Decl. Ex. 43.) The only reason this claim was allowed to proceed is that Horton alleged that Narbaitz was not a neutral *Skelly* officer and his complaint did not disclose his probationary status. (Dkt No. 64 at 22-23.) However, a pre-deprivation hearing need not be impartial as long as an impartial decisionmaker is provided at the post-termination hearing. *Walker v. City of Berkeley*, 951 F.2d 182, 184 (9th Cir.1991). Employees waive their right to challenge deficiencies in a pre-deprivation hearing when they fail to invoke their right to post-termination hearing. *Zografos v. City and County of San Francisco*, No. C 05-3881 PJHm 2006 WL 3699552, at *13 (N.D. Cal., Dec. 13, 2006.)  Here, under the relevant MOU, permanent employees have a right to a post-termination hearing. (*See* Ho Decl. ¶¶ 9-10, Ex. 1 at CCSF 01269-01270.) Assuming Horton had a right to pursue such a hearing, he declined to do so. (*Id.*) The Court should therefore hold Horton waived this claim.

### III.   Claim Nos. 3-5, 11-12: The Undisputed Evidence Shows Horton Cannot Prevail On His ADA & FEHA Disability Discrimination Claims

Horton has asserted five claims for disability discrimination under the ADA and FEHA (Claim Nos. 3-5, 11-12). (Shapiro Ex. 8 ¶¶ 75-114, 139-144.) While Horton's claims overlap and are not the model of clarity, they appear to be premised on the following theories: ADA and FEHA failure to provide a reasonable accommodation (Claim Nos. 3, 5, 11-12), FEHA failure to engage in the interactive process (Claim No. 12), and ADA disparate treatment (Claim No. 4). (*See id.*) Horton's claims are based on conduct in 2020, before Horton or the City were aware Horton had disability, as well as conduct in 2021, when Horton's alleged disability was disclosed but Horton refused to engage in the interactive process. Both Horton's 2020 and 2021 claims fail.

#### A.   Horton's 2020 Disability Discrimination Claims Fail Because The City Was Unaware of Horton's Alleged Disability Until February 2021.

To succeed on each of his disability discrimination claims under ADA and FEHA, Horton must show, among other things, that Defendants were aware Horton had a disability.[8] While Horton claims

---

[8] *Snapp v. United Transp. Union*, 889 F.3d 1088, 1095 (9th Cir. 2018) (ADA failure to accommodate); CACI 2541 (FEHA failure to accommodate), CACI 2546 (FEHA interactive process);

Defendants denied his accommodation requests in 2020 (Shapiro Decl. Ex. 8 ¶¶ 77), the undisputed evidence shows that *neither Horton nor Defendants* were aware that Horton had a disability at that time. In fact, Horton did not realize that he had a disability until February 2021, at which point he was immediately referred to SFPUC EEO for an interactive process to identify reasonable accommodations. (*See* Factual Background § VIII, *supra*.)

The ADA "does not require the plaintiff to speak any magic words before he is subject to its protections." *Schmidt v. Safeway, Inc.*, 864 F.Supp. 991, 997 (1994). At the same time, "the employee can't expect the employer to read his mind and know he secretly wanted a particular accommodation and sue the employer for not providing it. Nor is an employer ordinarily liable for failing to accommodate a disability of which it had no knowledge." *Id.* "When the nature of the disability, resulting limitations, and necessary accommodations are uniquely within the knowledge of the employee and his health-care provider, a disabled employee cannot remain silent and expect his employer to bear the initial burden of identifying the need for, and suggesting, an appropriate accommodation." *Taylor v. Principal Fin. Grp.*, Inc., 93 F.3d 155, 166 (5th Cir. 1996) The employee must make clear that they want assistance for a disability. *Powley v. Rail Crew Express LLC*, 25 F.4th 610, 612 (2022). "To prove discrimination, an employee must show that the employer knew of such employee's substantial physical or mental limitation." *Taylor at* 163.

In *Powley*, 25 F.4th 610, the Eighth Circuit affirmed dismissal of a failure-to-accommodate claim where the plaintiff requested an accommodation but never indicated that her request was connected to her alleged disability. *Id.* at 612-613. Likewise, EEOC guidance sets forth the following example: "An employee tells his supervisor that he would like a new chair because his present one is uncomfortable. Although this is a request for a change at work, his statement is insufficient to put the employer on notice that he is requesting reasonable accommodation. He does not link his need for the new chair with a medical condition." (Shapiro Decl. ¶ 54, Ex. 53 at 9.)

The requirements under FEHA are similar, and California courts interpreting FEHA follow

---

*Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1087 (9th Cir. 2001) (ADA disparate impact); *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 932 (7th Cir. 1995) ("Employer cannot be liable under the ADA for firing an employee when it indisputably had no knowledge of the disability.").

n:\labor\li2022\220258\01623450.docx

federal ADA case law. *See Scotch v. Art Inst. of California*, 173 Cal.App.4th 986, 1013 (2009). FEHA does not require employees to use magic words. *Id.* However, "[w]here the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer, ... the initial burden rests primarily upon the employee ... to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations." *Id.* (quoting *Taylor.,* 93 F.3d at 165).

Here, the undisputed evidence shows that Horton did not disclose, or even know, that he had a disability that required accommodation before he went out on leave in December 2020. Nor did he disclose limitations resulting from a disability. Horton testified he did not seek any medical care related to the August 12 assault until after he went out on leave in December 2020. (Shapiro Decl. Ex. 1 at 78:8-79:3.) Horton did not tell anyone at the City that that he had a medical or psychological condition that impeded his ability to work during the period before he went out on leave. (*Id.* at 295:23-296:10; Mabutas Decl. ¶ 29.) Then on February 21, 2021, after Horton went out on leave, he told Mabutas "I didn't realize I was suffering from trauma until having time to process these events and take preliminary tests," (*id.* Ex. 13) and asked for an ADA accommodation (*id.* Ex. 14). That same day, Horton was referred to EEO for the interactive process. (*Id.* Exs. 14-15.)

Horton now claims that his August 17, 2020 "assault accommodation" email to Mabutas (Mabutas Decl. Ex. 4) put the City on notice that he had a disability that required accommodation. (Shapiro Decl. Ex. 1 at 296:3-297:1.) But that email set forth Horton's concerns regarding the assault and security at 525 Golden Gate, and requested "safety accommodations." (Mabutas Decl. Ex. 4.) The email does not state or even suggest that Horton had a medical or psychological condition that impacted Horton's ability to work and that required accommodation. (*Id.*) The email does state "please let me know of any support systems or resources for people like myself whom have experienced such traumas." (*Id.*) But it never states that trauma impacted Horton's ability to work or that Horton required a workplace accommodation to deal with the trauma. Horton was not asking for a modification that allowed him to perform the essential functions of his job. He was merely asking about accommodations for his commute.

1    In any event, context matters. Mabutas immediately responded to Horton's August 17 email by

2    directing him to the City's EAP program and various other resources and offered to discuss the issue

3    further. (Mabutas Decl. Ex. 5.) Horton was also allowed to switch shifts with Larcina in deference to

4    Horton's security concerns and desire to change his commute. Before Horton went out on leave,

5    Horton did not complain to Mabutas or otherwise indicate he needed something more than what she

6    offered. (Mabutas Decl. ¶¶ 23, 28; Shapiro Decl. Ex. 1 at 105:2-24; 114:18-115:1.) To the contrary,

7    Horton thanked Mabutas for her "expedient response." (Mabutas Decl. Exs. 6-7.) Because Horton

8    failed to follow-up or otherwise disclose that he needed additional support for a disability, there can be

9    no finding that Defendants failed to accommodate or engage in the interactive process during this

10   period. *See Price v. Victor Valley Union High Sch. Dist.,* 85 Cal. App. 5th 231, 246, 301 Cal. Rptr. 3d

11   177, 189 (2022), reh'g denied (Nov. 29, 2022) (plaintiff did not meet her initial burden to initiate the

12   interactive process because "she never told the District she had a disability, did not seek an

13   accommodation for one, and did not tell the District of her physical limitations" and because she "did

14   not submit any medical documentation confirming the existence of a non-obvious disability.")

15   Horton's 2020 disability discrimination claims are premised on the notion that the City should

16   have recognized and diagnosed Horton's psychological condition before his medical providers.

17   Neither the ADA nor FEHA impose such an obligation on an employer.

18   **B.**    **Horton's 2021 Disability Discrimination Claims Fail Because He Could Not**
      **Perform The Essential Functions Of His Job And Because He Refused To Engage**
19    **In The Interactive Process.**

20   **1.**    **Horton's 2021 ADA/FEHA Failure to Accommodate Claims and 2021 ADA**
      **Disparate Treatment Claim Fail Because Horton Could Not Perform The**
21    **Essential Functions Of His Job (Or Any Other Job) With Or Without**
      **Accommodation.**

22   Horton's 2021 ADA and FEHA failure-to-accommodate claim and ADA disparate treatment

23   claim fail because the undisputed evidence shows that Horton could not work at all, either with or

24   without accommodation. Moreover, the only accommodation that was available to Horton under the

25   circumstances, indefinite leave, is not a reasonable accommodation as a matter of law.

26   To prevail on his ADA claims for disparate treatment and failure to accommodate, Horton

27   must show that he could perform the essential functions of his job with or without accommodation.

28
                                                    24

*See Bates v. United Parcel Serv.*, Inc., 511 F.3d 974, 990 (9th Cir. 2007) (disparate treatment); *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012) (failure to accommodate). Likewise, to prevail on his FEHA claim for failure to accommodate, Horton must show that he was able to perform the essential duties of his current position or a vacant alternative position for which he was qualified with or without accommodation. CACI 2541.

By his own admission, Horton was unable to work at all. The medical documentation Horton provided to the City uniformly stated that he was unable to work. (Shapiro Decl. Exs. 19, 21, 23, 30, 54 at 6-7.)  Horton notified the City that he was unable to work, either because he was in treatment, his doctor had not released him to work, or because he might "blow someone's brains out" if he returned to work. (*Id.* Exs. 1 at 206:13-20, 25, 29, 32, 34.) Horton also testified he could not return to work during this period, stating: "I didn't have two months or a year of treatment. I needed way more treatment." (*Id.* Ex. 1 at 227:2-228:22.)

Horton may argue he should have been granted a 100% telework accommodation. This argument fails for several independent reasons. First, Horton could not have performed the essential functions of his job as a stationary engineer while working remotely 100%. (Mabutas Decl. ¶¶ 2-7, Shapiro Decl. Ex. 4 at 11:11-12:16; 13:11-21:21.) Thus such an accommodation was not reasonable. *See Samper*, 675 F.3d at 1240 (accommodation that exempts plaintiff from an essential function is not reasonable). Second, Horton's medical provider never indicated that Horton had work restrictions that could have been accommodated through telework. Rather, she repeatedly represented that Horton could not work at all. (Shapiro Decl. Exs. 19, 21, 23, 30.) Third, Defendants commenced an interactive process that could have potentially allowed Horton to return to his position with an alternate accommodation or in another position that he could perform with accommodation (including potentially telework) or without, but Horton refused to participate. Throughout 2021, Nelson and Narbaitz repeatedly told Horton that the City was willing to evaluate other City positions for Horton as soon as he submitted medical documentation of work restrictions that did something other than state Horton was unable to work. (Shapiro Decl. Ex. 5: 66:5-67:16, 68:1-70:6, 98:7-99:16, Exs. 16, 26, 28, 32, 35, 40, 42-43.) Notwithstanding these requests, Horton and his provider insisted that Horton was

unable to return to work. (*Id.* Exs. 19, 21, 23, 25, 29, 30, 32, 34.) Because Horton represented he was

unable to work, the only accommodation available to him was leave. (*Id.* Ex. 5 at 55:5-9.)

As a matter of law, indefinite leave is not a reasonable accommodation. *Makor v. Burlington N.*

*Santa Fe Ry. Co.*, 680 F.App'x 542, 544 (9th Cir. 2017).[9] Here, there can be no dispute that Horton's

leave was indefinite. Horton submitted multiple notes from Girton, each one setting a later return to

work date. (Shapiro Decl. Exs. 19,  21, 23, 30.) The City extended Horton's leave on at least six

occasions. (*Id.* Exs. 20, 22, 24, 31, 33, 35.) After these six extensions, Horton still declined to state

"when and under what conditions he could return to work at all." *Dark*, 451 F.3d at 1090. Girton's last

note to the City, dated June 30, 2021, stated that Horton's "current estimated return to work updated

status is September 30, 2021." (Shapiro Decl. Ex. 30.) However, after September 30, Horton declined

to return to work or provide new information about his work restrictions that would have allowed the

City to craft an accommodation for him. About a month later, on October 23, following almost 11

months of leave accommodations, the City notified Horton that it intended to proceed with medical

separation and that it would be providing Horton with a final interactive process meeting. (*Id.* Ex. 43.)

Even then, Horton declined to provide information about his return-to-work status or updated

information about his work restrictions. (Ex. 1 at 369:23-370:4.) Instead, he merely sent threatening

emails to Narbaitz. (*Id.* Exs. 46-47.)

### 2. Horton's 2021 Disability Discrimination Claims Also Fail Because Horton Refused To Engage In the Interactive Process.

Each and every one of Horton's 2021 disability discrimination claims fail for the additional,

independent reason that the City made good faith efforts to engage in the interactive process, while

Horton refused to participate in that process.

"The interactive process requires (1) direct communication between the employer and

---

[9] *See also Dark v. Curry Cnty.*, 451 F.3d 1078, 1090 (9th Cir. 2006) ("[R]ecovery time of unspecified duration may not be a reasonable accommodation (primarily where the employee will not be able to return to his former position and cannot state when and under what conditions he could return to work at all)."); *Wood v. Green*, 323 F.3d 1309, 1314 (11th Cir. 2003) ("Wood was requesting an accommodation of indefinite leaves of absence so that he could work at some uncertain point in the future. Wood's requested accommodation was not reasonable."); *Myers v. Hose*, 50 F.3d 278, 280 (4th Cir. 1995) (requiring indefinite leave "would contravene the meaning of the phrase 'reasonable accommodation,' as provided in the [ADA].")

employee to explore in good faith the possible accommodations; (2) consideration of the employee's request; and (3) offering an accommodation that is reasonable and effective." *Zivkovic v. S. Cal. Edison Co.,* 302 F.3d 1080, 1089 (9th Cir. 2002) (cleaned up). The employer is not required to provide the accommodation that an employee requests, and is only required to provide "some reasonable accommodation." *Id.*

To prevail on his FEHA interactive process claim, Horton must show, inter alia, that he "was willing to participate in an interactive process to determine whether a reasonable accommodation could be made," and that Defendants "failed to participate in a timely good-faith interactive process." CACI No. 2546. Likewise, in a FEHA failure-to-accommodate claim, an employer can prevail on summary judgment if it can show that the employer "did everything in its power to find a reasonable accommodation, but the informal interactive process broke down because the employee failed to engage in discussions in good faith." *Jensen v. Wells Fargo Bank*, 85 Cal.App.4th 245, 262–63 (2000).

Likewise, "[g]ood faith is a defense to a claim seeking damages for discrimination under the ADA where the alleged discriminatory practice involves the provision of a reasonable accommodation." 9th Cir. Jury Instructions No. 12.13; *see also Hoppe v. Lewis Univ*., 692 F.3d 833, 840 (7th Cir. 2012). Here, the alleged lack of reasonable accommodation goes to the heart of all of Horton's ADA discrimination claims (Shapiro Decl. Ex. 8 ¶¶ 75-114), and the City has asserted a good faith defense in its Answer (Dkt No. 98 at 27). To prevail on this defense, an employer must show it "demonstrated good faith efforts, in consultation with [the plaintiff], to identify and make a reasonable accommodation that would provide [plaintiff] with an equally effective opportunity and would not cause an undue hardship on the operation of the business." 9th Cir. Jury Instructions No. 12.13. An employer's duty to engage in the interactive process can end if the employee fails to submit sufficient medical documentation or participate in the search for an alternative accommodation. *Allen v. Pac. Bell*, 348 F.3d 1113, 1115 (9th Cir. 2003).

The Seventh Circuit's decision in *Steffes v. Stepan*, 144 F.3d 1070, 1073 (7th Cir. 1998) is instructive. In that case, the court affirmed the trial court's order granting defendant's motion for summary judgment as to the plaintiff's ADA claims, finding the employee caused a break down in the

interactive process where the employee did not make efforts to clarify the nature and extent of her work restrictions, update the employer on her condition, or provide information about the positions she could perform and the level of chemical exposure she could tolerate. *Id.* at 1072-73. The court noted that "[w]here the missing information is of the type that can only be provided by one of the parties, failure to provide the information may be the cause of the breakdown and the party withholding the information may be found to have obstructed the [interactive] process." *Id.* at 1072  (quoting *Beck v. University of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1136 (7th Cir. 1996)).

Likewise, the undisputed evidence here shows Horton stubbornly refused to engage in the interactive process. At deposition, Horton claimed he wanted an accommodation, such as telecommuting, that would have allowed him return to work and that Defendants limited him to leave. (Shapiro Decl. Ex. 1 at 235:13-236:17.) But the undisputed evidence shows Horton repeatedly refused to provide information Defendants needed to find accommodations other than leave, and Horton represented that he could not return to work. (*Id.* Exs. 19, 21, 23, 25, 29, 30, 32, 34, 39.)

Horton first requested a reasonable accommodation for a disability on February 21, 2021. (Shapiro Decl. Exs. 13-15.) The following day, Nelson told Horton to provide "a note from your healthcare provider that lays out what your reasonable restrictions actually are." (*Id.* Ex. 16.) Horton did not do so. Instead, on March 13, Horton provided Nelson with a letter from Girton stating that Horton was "unable to return to work." (*Id.* Ex. 19.) Nelson took Horton at his word and repeatedly granted him leave as a temporary reasonable accommodation. (*Id.* Exs. 20, 22, 26, 31, 33.) Nelson even talked to Girton directly about providing the necessary documentation, but Girton never did so. (*Id.* Ex. 5 at 51:18-52:24.) On April 6 and 26, Girton sent Nelson two more letters, again stating only that Horton could not return to work. (*Id.* Exs. 21-23.) On April 27, May 5, and May 10, Nelson reiterated to Horton that he could be returned to work at his job or another vacant City position if Horton provided medical restrictions that did something other than place off him work. (*Id.* Ex. 5 at 66:5-67:16, 68:1-70:6, Ex. 26, 28.) Horton again declined to provide the requested documentation. Instead, on July 2, Horton sent Nelson a fourth note from Girton, again placing him off work. (Ex. 30.) On July 14, Nelson asked to schedule a call "so we can discuss your latest doctor's note and explore

some other ways we might be able to accommodate you." (*Id.* Ex. 32.) On a call that same day, Nelson stressed the need for medical documentation of Horton's work restrictions so they could explore accommodations other than leave. (*Id.* Ex. 5 at 98:7-99:16.) The City's good faith efforts to obtain the necessary information for an accommodation are well documented and indisputable. Ironically, Horton responded by claiming he was "being pressured to return to work." (*Id.* Ex. 32.)

Horton's interactions with Pearson and Narbaitz were no different. On August 11, Horton told Pearson he was still in treatment and could not return to work. (Shapiro Decl. Ex. 34.) On August 16, Narbaitz again informed Horton that the City might be able to provide him with an accommodation that would allow him to return to work at his former position or another vacant City position if Horton could provide the required documentation from his medical provider. (*Id.* Ex. 35.) Rather than providing such documentation, Horton repeatedly accused Narbaitz of misconduct. (*Id.* Exs. 39, 41-42.) On August 19 and August 20, Narbaitz again stressed the need for Horton to "provide the SFPUC with medical restrictions that do more than simply place you 'off work.'" (*Id.* Exs 40, 42.) After Horton's final leave extension expired on September 30, Horton declined to provide the City with an updated return to work status, or otherwise provide the City with updated work restrictions. On October 23, Narbaitz provided Horton with notice of SFPUC's intent to medically separate him, and invited him to submit any materials he wanted SFPUC to consider before making the decision. (Ex. 43.) And on November 1, 2021, Narbaitz held a final interactive process meeting with Horton. (*Id* Ex. 1 at 365:18-24.) Rather than taking advantage of these opportunities to show that he could return to work as a stationary engineer or in some other role with or without accommodation, Horton accused Narbaitz of being abusive and threatened her with legal action. (*Id.* Exs. 45-47.)

At deposition, Horton testified he believed the City needed to allow him telecommute full-time before Girton could provide a letter laying out medical restrictions that allowed him to return to work under those conditions. (Shapiro Decl. Ex. 1 at 401:24-407:8.) But Horton conceded neither Girton nor anyone from the City told Horton that was the process. (See *id.* Ex. 1 at 405:5-407:8.) To the contrary, the City repeatedly told Horton that he needed to provide documentation of medical restrictions that did something other than place him off work before the City could consider possible accommodations

1    other than leave. (*Id.* Exs. 17, 28, 32, 35, 40, 42, 43.)

2         In any event, Horton's professed understanding of the reasonable accommodation process --

3    which was contrary to everything the City told him and based on nothing more than speculation

4    (Shapiro Ex. 1 at 406:2-407:6) -- was incorrect and backwards. The law is clear that an employer has

5    the ultimate discretion to choose between two or more possible accommodations. *U.S. E.E.O.C. v.*

6    *UPS Supply Chain Sols.*, 620 F.3d 1103, 1111 (9th Cir. 2010). Moreover, employers are entitled to

7    request documentation of an employee's limitations, because both the ADA and FEHA require

8    "employers to reasonably accommodate limitations not disabilities." *Scotch*, 173 Cal. App. 4th at

9    1013. As explained in EEOC guidance, when a disability "is not obvious, the employer may ask the

10   [employee] for reasonable documentation about his/her disability and functional limitations," and the

11   employer "may require that the documentation about the disability and functional limitations come

12   from an appropriate health care or rehabilitation professional." (Shapiro Ex. 53 at 12.) EEOC guidance

13   further provides that where an employee "refuses to accept an effective accommodation, s/he may not

14   be qualified to remain in the job" (*Id.* at 18.)

15        Nelson's testimony confirms that Horton's understanding of the process was backwards.

16   Nelson testified that "work restrictions are what are needed to craft an effective accommodation.

17   Because we're accommodating around those specific work restrictions." (Shapiro Decl. Ex. 5 at 18:3-

18   16.) Nelson further testified that he had never heard of an instance where a medical provider asked

19   SFPUC to describe an accommodation so that the provider could formulate the employee's work

20   restrictions, stating "[t]hat's not how it works." (*Id.* at 19:14-22.) Nelson explained: "we can't craft an

21   accommodation for an employee without knowing what their work restrictions are. It's very much

22   putting the cart before the horse. Because we can't accommodate something if we don't know what

23   we're accommodating. And the restrictions are what we have to accommodate." (*Id.* at 19:23:-20:5.)

24        In sum, all of Horton's disability discrimination claims fail because, after Defendants learned

25   Horton had a disability, Defendants made good faith efforts to engage in the interactive process.

26

27

28

Horton v. CCSF - CCSF MSJ                                          n:\labor\li2022\220258\01623450.docx
CASE NO. 3:22-cv-03174-WHO

**IV.    Claim No. 17: Horton's Labor Code § 6311 Claim Fails Because Horton Cannot Prove Causation, Horton Did Not Refuse To Work Due To Safety Violations, and Horton Cannot Prove A Real and Apparent Hazard.**

Horton asserts a claim under Labor Code § 6311, alleging Defendants retaliated against him for refusing to work in violation of health and safety standards. This claim fails for at least four reasons.

**First**, Horton cannot prove causation. As discussed, the City had legitimate, non-retaliatory reasons for terminating Horton's employment – he could not return to work with or without accommodation, and he refused to engage in the interactive process. (*See* Argument § III.B, *supra*.) There is no evidence that Defendants were trying to punish Horton for refusing to work in an unsafe environment. Indeed, Defendants allowed Horton to go out on leave for almost a year, made good faith attempts to engage in the interactive process in an attempt to get Horton back to work with an accommodation, and offered Horton safety accommodations as well. (See Background §§ VII-XIII.) And since Horton's medical provider certified that he was unable to work (Shapiro Decl. Exs. 19, 21, 23, 30), there was no reason for Defendants to believe that Horton was refusing to return to work due to alleged safety violations.

**Second**, the undisputed evidence shows that Horton refused to work because his medical condition precluded him from doing so, not because of workplace safety concerns. *See Caldwell v. OS Rest. Servs.*, LLC, CV 19-00754 DMG (MRWx), 2021 WL 3264306, at *8 (C.D. Cal. May 13, 2021) (granting summary judgment on a § 6311 claim because "it is undisputed that [plaintiff] never refused to work because of workplace safety concerns"). Horton testified he could not return to work because he needed more treatment. (Shapiro Decl. Ex. 1 at 227:2-228:22.) Horton also repeatedly told the City he was unable to work because he needed medical help and he was still in treatment. (*Id.* Exs. 8, 29, 34, 39.) And Horton submitted four notes from his medical provider stating he could not work due to a medical condition. (*Id.* Exs. 19, 21, 23, 30.) Horton's claim that he could not return to work due to safety concerns is further contradicted by the fact that he declined to talk with Nelson about safety accommodations (*id.* Ex. 1 at 216:14-217:5), and his refusal to consider accommodations involving other job sites (*id.* Ex. 5 at 68:1-69:21).

**Third**, Horton has no evidence his workplace was unsafe in 2021, when he declined to return

31

1    to work. To prevail on a § 6311 claim, Horton must show, among other things, that there was a

2    violation of a health and safety standard, including Labor Code § 6400, that "would create a real and

3    apparent hazard to the employee or their fellow employees." Lab. Code § 6311. It is not enough that

4    Horton reasonably believed his workplace was unsafe. *See Hentzel v. Singer*, 138 Cal.App.3d 290,

5    299-300; *Frazier v. United Parcel Serv., Inc*., No. 1:02CV6509OWWDLB, 2005 WL 1335245, at *12

6    (E.D. Cal. May 3, 2005). Because § 6311 "protects the more drastic conduct of refusing to work where

7    some occupational safety or health standard . . . will be violated," the statute requires a plaintiff to

8    show that a real and apparent hazard actually existed. *See id.*

9         Here, Horton has no evidence demonstrating that, in 2021, there was a violation of any safety

10   standards, including the general standards set forth in Labor Code § 6400. Horton testified that he had

11   done practically nothing to assess the safety of the area around 525 Golden Gate after he went out on

12   leave. Specifically, Horton testified he believed the area was unsafe because he drove through "a few

13   times" and had observed several "unsafe activities," such as "homeless encampments," and a few

14   individuals informed him "nothing had changed" in the Tenderloin. (Shapiro Decl. Ex. 1 at 315:2-

15   318:1.) Based on "homeless encampments" and vague reports of neighborhood conditions, Horton

16   believes that anyone who worked in or around 525 Golden Gate (including the entire staff of the

17   Phillip Burton Federal Building), is working in conditions that violate safety standards and, by

18   implication, everyone in the area may refuse to report to work indefinitely. (*Id.* at 316:11-21.)

19        Horton may also point to the August 12 assault and the alleged stalking. But the assault did not

20   occur in the workplace and thus is irrelevant to a § 6311 claim. In any event, the assault happened over

21   6 months before Horton declined to return from FMLA leave in February 2021, and over 15 months

22   before he was medically separated in November 2021. Likewise, the alleged stalking happened well

23   before Horton refused to return to work. And Horton cannot recall a single detail concerning the

24   alleged stalking, and thus it is impossible to know whether that alleged stalking rendered the

25   workplace unsafe. (Shapiro Decl. Ex. 1 at 93:6-94:19.) In any event, there is no evidence that any

26   other SFPUC employees were assaulted or stalked while on duty around 525 Golden Gate during this

27   period, and Horton declined Nelson's offer to discuss accommodations that would have addressed his

28

Horton v. CCSF - CCSF MSJ
CASE NO. 3:22-cv-03174-WHO

n:\labor\li2022\220258\01623450.docx

safety concerns. (*Id.* Ex. 55, Ex. 1 at 216:14-217:9.)

**Fourth**, it strains credulity that every building in the Civic Center area constitutes an unsafe working environment because of the presence of unhoused persons and because crime sometimes occurs in the area. And no authority supports the proposition that § 6311 protects an employee who refuses to work due to general concerns about the existence of crime in an urban area, especially where the employee refuses to discuss safety accommodations or alternative worksites.

## V. Claim Nos. 2, 6, 13, 15: Horton's Title VII, ADA, FEHA, and Labor Code § 1102.5 Retaliation Claims Fail Because Horton Cannot Prove Causation.

Horton's other retaliation claims, which are brought under Title VII, the ADA, FEHA, and California Labor Code § 1102.5, fail because there is no causal connection between a protected activity (e.g., requesting accommodations or opposing alleged unlawful practices) and an adverse employment action, an essential element of the prima facie case for each claim.[10]

The *McDonnell-Douglas* burden shifting framework applies to retaliation claims under Title VII, ADA, and FEHA.[11] Once the plaintiff has established a prima facie case, including evidence of causation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory explanation for its decisions. *Yartzoff*, 809 F.2d at 1376. The burden then shifts back to the plaintiff to show the alleged explanation is pretextual. *Id.* at 1377. In the § 1102.5 context, the plaintiff must show that retaliation "was a contributing factor" to the adverse action. *Lawson v. PPG Architectural Finishes, Inc.*, 12 Cal.5th 703, 718 (2022). The burden shifts to the employer to demonstrate, "by clear and convincing evidence, that it would have taken the action in question for legitimate, independent reasons even had the plaintiff not engaged in protected activity." *Id.*

Horton cannot demonstrate causation under either standard. **First**, Horton cannot meet his initial burden on causation because there is no evidence that the relevant decision makers were even aware of Horton's purported protected activity. *See Morgan v. Regents of Univ. of Cal.*, 88 Cal. App.

---

[10] *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000) (Title VII); *Brown v. City of Tucson*, 336 F.3d 1181, 1187 (9th Cir. 2003) (ADA); CACI 2505 (FEHA); CACI 4603 (§ 1102.5).

[11] *Yartzoff v. Thomas*, 809 F.2d 1371, 1375 (9th Cir. 1987) (Title VII), *Kelly v. Boeing Co.*, 400 F.Supp.3d 1093, 1107 (D. Or. 2019) (ADA); *Ruiz v. RSCR California, Inc.*, 683 F.Supp.3d 1079, 1099 (C.D. Cal. 2023) (FEHA).

4th 52, 69, 105 Cal. Rptr. 2d 652 (2000) (retaliatory motive proved by showing that "employer was aware of the protected activities.) The decision to terminate Horton was made by Herrera, upon the recommendation of Gardunio and Flynn. (Gardunio Decl. ¶ 6.) Horton never interacted with these individuals and they had no reason to believe Horton had engaged in protected activity.

**Second**, there is no temporal proximity and intervening factors break the causal chain.[12] Horton first requested a reasonable accommodation and accused Mabutas of discrimination in February 2021. (Mabutas Decl. Ex. 8, Shapiro Decl. Ex. 15.) He first accused Nelson of misconduct in May 2021. (Shapiro Decl. Ex. 25.) But Horton was not terminated until November 2021. In the interim, Horton's leave was extended multiple times as a temporary reasonable accommodation, and the City made good faith efforts to engage in the interactive process. (*See* Argument § III.B, *supra*.)

**Third**, Horton cannot prove causation for the additional reason that, when a plaintiff is on notice of an intended adverse employment action, they cannot "create a [retaliation] claim" by "making a complaint . . . before the anticipated adverse employment action occurs." *Diego v. City of Los Angeles*, 15 Cal.App.5th 338, 364-65 (2017). Here, Horton first complained about Nelson on April 28, 2021, immediately after Nelson warned Horton he may be medically separated if he could not return to work. (*See* Shapiro Ex. 5 at 80:25-82:2; *id.* Ex. 25.) Likewise, Narbaitz first contacted Horton by email on August 16, cautioning Horton that he would be medically separated if he could not return to work with or without reasonable accommodation. (Shapiro Decl. Ex. 35.) Horton immediately responded, accusing Narbaitz of "deception" and "fraud." (*Id.* Ex. 39.) Horton also told Narbaitz he had filed complaints against her with the EEOC and DFEH on November 1, a week *after* Narbaitz notified him that SFPUC intended to medically separate him. (*Id.* Exs. 43, 45.) On November 30, after Horton declined to return to work and declined to substantively respond to the notice of intent to medically separate, SFPUC followed through with the medical separation that Nelson and Narbaitz had warned Horton about. Just as in *Diego*, Horton is trying to manufacture a retaliation claim by

---

[12] See *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) (18-month lapse between protected activity and adverse action is "simply too long" to give rise to an inference of causation); *Ghirmai v. Nw. Airlines, Inc.*, 131 F. App'x 609, 611 (9th Cir. 2005) (affirming summary judgment as to Title VII retaliation claim because "intervening events, such as [plaintiff's] positive reviews and assistance, breack the causal connection").

Horton v. CCSF - CCSF MSJ
CASE NO. 3:22-cv-03174-WHO

n:\labor\li2022\220258\01623450.docx

complaining about an anticipated employment action after being put on notice it was about to occur.

**Fourth**, the undisputed evidence shows that the City had legitimate non-discriminatory reasons for medically separating Horton. As discussed, Horton could not return to work with or without accommodation, indefinite leave was not a reasonable accommodation, and Horton refused to engage in the interactive process. (*See* Argument § III.B, *supra*.) Accordingly, the burden shifts to Horton to prove that Defendants' proffered reason is a pretext for retaliation. This is a burden Plaintiff cannot meet for the reasons set forth above. Moreover, none of the correspondence discussed in the Background section exhibits any retaliatory intent; Horton cannot point to any words or conduct by Mabutas, Nelson, or Narbaitz (or any relevant decisionmakers) that exhibited retaliatory intent; Horton cannot show that the relevant decision makers were aware of his purported protected conduct; and Horton has no evidence the City treated any differently than similarly situated individuals who did not engage in protected activity.

## VI.   Claim No. 14: Horton's FEHA Claim For Failure To Prevent Discrimination And Harassment Fails Because Horton Cannot Prove Any Discrimination Or Harassment Occurred.

A claim for failure to prevent discrimination and harassment under FEHA requires a predicate claim of discrimination and harassment. *See Scotch v. Art Inst. of Cal.*, 173 Cal.App.4th 986, 1021 (2009). If Horton's predicate claims fail, so too does his failure to prevent claim.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' Motion for Summary Judgment in its entirety, and award Defendants costs per Federal Rule of Civil Procedure 54(d).

1   Dated:  September 6, 2024

2                                              DAVID CHIU
                                               City Attorney
3                                              ROSE DARLING
                                               Chief Labor Attorney
4                                              ADAM SHAPIRO
                                               Deputy City Attorney

5

6                                      By: *Adam Shapiro*
                                               ADAM SHAPIRO
7
                                               Attorneys for Defendants City
8                                              and County of San Francisco, San Francisco
                                               Public Utilities Commission
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

36