United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CORY A. HORTON,

               Plaintiff,

      v.

CITY AND COUNTY OF SAN
FRANCISCO, et al.,

               Defendants.

Case No.  22-cv-03174-WHO

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT**

Re: Dkt. Nos. 107, 110

      Plaintiff Cory Horton asserts thirteen claims against his former employer, defendants City and County of San Francisco and the San Francisco Public Utilities Commission, which is a department of the City and County of San Francisco (collectively, the "City" or "defendants"), stemming from a third-party attack that Horton suffered in August 2020 while he walked to work. He contends that the City failed to reasonably accommodate his resulting disability, discriminated against him on the basis of that disability, retaliated against him, fostered a hostile work environment, and failed to provide him with the due process he was owed regarding his eventual medical separation.  The City moves for summary judgment on all claims, arguing that the undisputed facts establish that all of Horton's claims fail on the merits, and some for lack of proper procedure.

      The record shows that in the aftermath of the attack, the City worked with Horton to accommodate his safety concerns and his disability.  It granted him a leave of absence upon his request and extended it six times between March 2021 and November 2021.  Horton did not work in-person between December 2020, when he went on family medical leave, until the date of his medical separation nearly a year later.  In the intervening months, the City engaged in the interactive process, but the accommodation that Horton sought—100% telework—was not

1    reasonable given the nature of his job.  Nothing in the record supports that the City discriminated

2    against Horton, retaliated against him, or subjected him to hostility.  Many of his claims also fail

3    for lack of administrative exhaustion or other procedural deficiencies.  None can prevail.  The

4    City's motion is GRANTED.

5    <center>**BACKGROUND**</center>

6    Starting in December 2019, Horton worked as a stationary engineer, designated as a

7    temporary employee, at the San Francisco Public Utilities Commission ("SFPUC") Headquarters

8    located at 525 Golden Gate Avenue, San Francisco ("525 Golden Gate"); he provided onsite

9    maintenance and repaired the building's HVAC system. *See* Declaration of Maria Mabutas

10   ("Mabutas Decl.") [Dkt. No. 107-57] ¶ 3; *id.* Ex. 7; *see also* Declaration of Rachel Gardunio

11   ("Gardunio Decl.") [Dkt. No. 107-58] ¶¶ 2-3.

12   The incident that led to this litigation occurred on August 12, 2020.  On that day, Horton

13   commuted to work via BART.  He exited his train at the Civic Center BART station and was

14   assaulted by three individuals.  *See* Shapiro Decl. Ex. 9 (San Francisco Sheriff Incident Report

15   from August 12, 2020).

16   On August 17, 2020, Horton told his manager at the SFPUC, Al Larcina, and the Facilities

17   Director at 525 Golden Gate, Maria Mabutas, what happened, and informed them that he did not

18   feel safe commuting to work.  *See* Oppo. Ex. 18; Mabutas Decl. ¶¶ 12-29; Mabutas Decl. Exs. 4-6.

19   He stated that the attack "altered [his] life," and that he had to "change [his] commuting

20   practices," causing an "unexpected long-term expense that would not exist if not for this incident."

21   *See* Oppo. Ex. 18 at p. 105.  He asked Mabutas whether there were any "commuting

22   accommodations, safety accommodations, [or] further security" that the City could offer to make

23   him feel safer on the way to work. *Id.*  He also asked whether there were "support systems or

24   resources" for people like him who had "experienced such severe traumas," and inquired as to

25   what the SFPUC was doing to increase security around the area. *Id.*

26   Mabutas responded the same day.  She said that she was aware of the attack and that the

27   building managers had been informed.  *See* Mabutas Decl. Ex. 5.  She also told Horton that he had

28   been sent information about the Employee Assistance Program and other safety related

United States District Court
Northern District of California

<center>2</center>

1    information and added that she was working on finding him a temporary parking spot so that he

2    could drive to work. *Id.*

3          On December 10, 2020, Horton began Family Medical Leave Act ("FMLA") because he

4    had become a father.  Four days later, on December 14, 2020, he accepted appointment to a

5    Permanent Civil Service ("PCS") position.  *See* Declaration of Adam Shapiro ("Shapiro Decl.")

6    [Dkt. No. 107-7], Ex. 7 at 1.  The Notice and Report of Probationary Status that he signed

7    indicated that his probationary period would last for 2080 work hours and that he had received no

8    credit for his prior service.[1]  *Id.*; *see also* Horton's Opposition ("Oppo.") [Dkt. No. 108] Ex. 1.

9          While he was on FMLA leave, which was scheduled to last through March 2021, *see*

10   Mabutas Decl. ¶¶ 30-31, Horton submitted two claims for worker's compensation arising from

11   complications he was experiencing in the wake of the August 2020 attack.  He submitted the first

12   claim on February 10, 2021.  *See* Shapiro Decl. Ex. 36 (email from Horton to Larcina and

13   Mabutas, dated February 10, 2021, attaching DWC-1 form).  It was denied because the assault had

14   not occurred at work.  *See* Declaration of Silvia Recinos ("Recinos Decl.") [Dkt. No. 107-61] Ex.

15   2 (worker's compensation denial letter, dated February 16, 2021).

16         Horton submitted the second claim on February 21, 2021, alleging that he had been stalked

17   by his attackers while at work sometime *after* the August 12, 2020, assault and before he went on

18   FMLA leave in December 2020.  *See* Shapiro Decl. Ex. 37 (second worker's compensation form,

19   dated February 21, 2021).  He stated: "After returning to work following my assault on the week

20   of Aug. 17th of 2020 through Aug. 20th 2020 and the following work [sic] Aug. 23rd [through]

21   Aug. 27th week I had experienced multiple traumas during my AM duty rounds many of which

22   continued all through December 3rd of 2020." *Id.*  He reported that he had "tried to block many of

23   these occurrences out," so the "dates [might] not be exact."  *Id.*  He indicated that he had been

24   followed to and from work on several occasions after he was attacked.[2]  This was the first time

25   _____

26   [1] The notice also stated, mistakenly, that his probationary period would end on December 10,
     2020, four days before he signed the notice.  As discussed in Section VI, below, this was a
27   typographical error.  The correct date for the anticipated end of his probationary period was
     December 10, 2021.

28   [2] The letter at times conflates the incident that occurred on August 12, 2020, which had been

United States District Court
Northern District of California

that Horton notified the City of these continuing incidents.  Mabutas Decl. ¶¶ 35-38.

On the same day that he submitted his second claim, Horton requested accommodation for his disability.  *See* Shapiro Decl. Exs. 13-15.  He emailed Mabutas, stating "I didn't realize I was suffering from trauma until having time to process these events and take preliminary tests.  All the events and encounters mentioned have led to an increased anxieties and more issues.  I don't want to return to my job in such an unstable state neither do I want to lose my job of which I really love and enjoy for not showing up.  However, I do need help with this issue.  Can you please help?" *Id.* Ex. 13 (email dated February 21, 2021).  He also emailed the City's ADA coordinator, Joan Philpott, asking whether there was an "accommodation for a change of my job/remote telecommuting," because he "just can't physically return to the site at this time."  *Id.* Ex. 14. When Philpott asked what the issue was, Horton replied that he had "suffered repeated trauma at my job by my attackers while at work," had "multiple encounters" with his attackers while doing his morning duties, but it "wasn't until [he] had the time to look closer that it is now apparent how much danger I was in." *Id.*  He explained that his anxieties were very high because of the level of gang activity in the area surrounding 525 Golden Gate. *Id.*  He asked to "continue working" but explained that he did not feel safe working in the "current capacities." *Id.*

The ADA coordinator forwarded Horton's request to Rick Nelson, the Equal Employment Opportunity ("EEO") Programs Manager at SFPUC.  *See id.* Ex. 15.  Nelson emailed Horton the reasonable accommodation request packet with instructions on how to complete it with a healthcare provider and instructions to contact Nelson if Horton had questions. *Id.*

Horton filled out the reasonable accommodation request form and sent it back to Nelson, *see id.* Ex. 15 at pp. 5-7.  He initially attached doctors' notes from visits before he started working for SFPUC.  *See id.* Ex. 16 at p. 3 (doctor's note from October 2019 indicating that at that time Horton had a "medical condition" that was "exacerbated by his current position" and he would benefit from a "less stressful position"); *id.* p. 4 (doctor's note from April 2016 indicating that Horton had a depressive disorder).

_____

reported to the sheriff's office and to Horton's employers, and incidents that occurred later.

Nelson responded to Horton the same day, explaining that he would need more specific information about Horton's condition to assess any accommodation request. *See id.* Ex. 17. He explained that he did not need "details of [Horton's] diagnosis," but he would need to see something that is "specific as to what you can and cannot do, and specific as to the expected duration of the condition." *Id.* Horton provided some of the requested information. *See id.* Ex. 19 (doctor's note requesting "Leave of Absence extension" for Horton, dated March 14, 2021). On March 15, 2021, Nelson granted him a temporary reasonable accommodation leave through April 12, 2021. *Id.* Ex. 20.

Throughout the next seven months, the City extended Horton's leave of absence five more times. *See* Shapiro Decl. Exs. 21-36. Each time, the extensions followed the submission of a medical note from Horton's doctor explaining that he could not return to work at all. *See e.g.*, *id.* Ex. 19 (letter from Jeryl Girton, NP, stating: "Please accept this letter as written Notification that Mr. Cory Horton is unable to attend work and carry out his regular job duties at this time," and anticipating a return date of April 12, 2021); *id.* Ex. 21 (letter from same doctor's office, stating that Horton was still unable to attend work and carry out his regular job duties).

At some point in April 2021, Horton and Nelson had a conversation that prompted Horton to express that he felt that he was being "rushed and pressured to enter back to an environment that is unsafe." *Id.* Ex. 25. Nelson responded that he did not intend to rush Horton back to work, and that his goal "as a reasonable accommodation coordinator is to find ways that employees with either temporary or permanent disabilities can eventually return to work." *Id.* Ex. 26. Nelson explained that he was "asking for additional medical documentation" because he was "trying to explore other potential accommodations," but did not know what those could look like without more information about Horton's medical restrictions. *Id.* Nelson further stated that "[t]here are timelines for getting back to work but nothing is set in stone . . . [leave] can't be indefinite, but we allow a reasonable amount of time depending on the circumstances." *Id.* He finally explained that medical separation, which had apparently been brought up in a prior conversation with Horton, was not a given, but would be the last resort if "all other options" had been exhausted. *Id.*

The last extension, dated August 16, 2021, extended Horton's leave of absence until

1    September 29, 2021.  *See id.* Ex. 35.  Nelson and another EEO coordinator, Dena Narbaitz,

2    warned Horton on several occasions that if they could not find a reasonable accommodation for

3    his condition, medical separation might be the result; Horton responded to these warnings with

4    threats to sue Nelson and Narbaitz.  *See id.* Exs. 5, 25, 39.[3]

5           On October 23, 2021, the SFPUC sent Horton a letter informing him that it was

6    recommended that he be medically separated.  Shapiro Decl. Ex. 43.  On November 1, 2021, right

7    before an interactive process meeting was scheduled to start, Horton emailed Narbaitz, stating:

8    "Please know I have filed DFEH and EEOC complaints against you." Shapiro Decl. ¶ 47, Ex. 45.

9    This was the first time that Horton notified Narbaitz that he had filed a complaint against her with

10   DFEH and EEOC. *Id.* Ex. 1 at 361:6-365:4.  Shortly thereafter, Horton filed internal complaints

11   against Narbaitz. *See* Shapiro Decl. Exs. 46-47 (emails from Horton to Narbaitz stating that

12   Narbaitz had been "extremely abusive and inconsiderate of rights").

13          On November 30, 2021, the City medically separated Horton.  *See id.* Ex. 48 (Notice of

14   Medical Separation, stating "[t]his letter is to inform you that you are hereby medically separated

15   from your employment with the City and County of San Francisco . . . [as a PCS Engineer] with

16   the [SFPUC]").  He had been on leave since his FMLA leave began in December 2020; he had

17   been on an extended leave of absence for nearly nine months.  During Horton's leave, he did not

18   earn any time that could be credited toward his probationary period.  *See* Gardunio Decl. ¶ 4.

19          On February 4, 2022, Horton filed an administrative complaint with the EEOC, asserting

20   two allegations: (1) that he was "denied the interactive process and reasonable accommodations,"

21   *see* Shapiro Decl. No. 49 (EEOC Complaint, Allegation 1); and (2) that he was retaliated against

22   for requesting accommodations for his disability, *id.* (Allegation 2).

23          Horton filed this action on May 31, 2022.  After three amended complaints, the only

24   remaining defendants are the City and County of San Francisco and the SFPUC.  The City moved

25   for summary judgment on the 13 remaining claims.  *See* Motion for Summary Judgment

26

27   [3] In the TAC, Horton says that on August 19, 2021, he filed a complaint against Narbaitz alleging
     that she had denied him participation in the interactive process and was discriminating against him
28   on the basis of his disability.  No evidence of this complaint exists in the record.

United States District Court
Northern District of California

1   ("Motion") [Dkt. No.107].

2                                    **LEGAL STANDARD**

3          Summary judgment on a claim or defense is appropriate "if the movant shows that there is

4   no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

5   law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show

6   the absence of a genuine issue of material fact with respect to an essential element of the non-

7   moving party's claim, or to a defense on which the non-moving party will bear the burden of

8   persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has

9   made this showing, the burden then shifts to the party opposing summary judgment to identify

10  "specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary

11  judgment must then present affirmative evidence from which a jury could return a verdict in that

12  party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

13         On summary judgment, the court draws all reasonable factual inferences in favor of the

14  non-movant. *Id.* at 255. In deciding a motion for summary judgment, "[c]redibility

15  determinations, the weighing of the evidence, and the drawing of legitimate inferences from the

16  facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony

17  does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See*

18  *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

19         When a plaintiff is proceeding pro se, the court has an obligation to construe his motions

20  and pleadings liberally. *See Zichko v. Idaho*, 247 F.3d 1015, 1020 (9th Cir. 2001); *see also*

21  *Christensen v. CIR*, 786 F.2d 1382, 1384 (9th Cir. 1986).[4]

22

23

24

25  ────────────────

    [4] Horton has represented himself through much of this action. I appointed counsel through the
26  Federal Pro Bono Program to assist him in drafting an amended complaint and to represent him in
    a settlement conference. Counsel helped amend the complaint, defended against the City's motion
27  to dismiss, and participated in an unsuccessful mediation. After he completed his limited
    representation, the Pro Bono Program was unable to locate another counsel for Horton for the
28  remainder of the case. I stayed this matter for several more weeks to give Horton time to find a
    lawyer, but he was unable to do so. Since that time he has been proceeding pro se.

United States District Court
Northern District of California

**DISCUSSION**

## I.    ADA AND FEHA DISABILITY CLAIMS

To establish a prima facie case under the Americans with Disabilities Act ("ADA") and survive summary judgment, Horton "must show: (1) [he] is a qualified individual with a disability; (2) [he] was denied a reasonable accommodation that he needs in order to enjoy meaningful access to the benefits of public services; and (3) the program . . . is a public entity." *Csutoras v. Paradise High Sch.*, 12 F.4th 960, 968–69 (9th Cir. 2021) (quoting *A.G. v. Paradise Valley Unified Sch. Dist*. No. 69, 815 F.3d 1195, 1204 (9th Cir. 2016)).  To establish a prima facie case for failure to make reasonable accommodations under the California Fair Employment and Housing Act ("FEHA"), Horton must show that, (1) he has a disability under the FEHA; (2) he is qualified to perform the essential functions of the position; and (3) the City failed to reasonably accommodate his disability. *Scotch v. Art Inst. of Cal.-Orange Cnty., Inc.*, 173 Cal. App. 4th 986, 1009-10 (2009) (citation omitted). "Reasonable accommodation" means a "modification or adjustment to the workplace that enables a disabled employee to perform the essential functions of the job held or desired." *Nadaf–Rahrov v. Neiman Marcus Grp., Inc.*, 166 Cal. App. 4th 952, 974 (2008).

The undisputed facts show that Horton cannot prevail on his ADA and FEHA claims. When the City became aware of his disability, it engaged him in the interactive process in an attempt to provide him with reasonable accommodations.  Nothing in the record supports that the City or its employees discriminated against him based on his disability or otherwise treated him in a disparate fashion.

### A.    Claims 3, 5, 11-12: Failure to Provide Reasonable Accommodation and Disability Discrimination

Horton argues that the City failed to provide a reasonable accommodation after he requested it first on August 17, 2020, and then again on February 21, 2021.  *See* Claims 3, 5 (ADA); Claims 11-12 (FEHA).  The record does not support him for two distinct reasons. First, he did not inform his employer of his non-obvious disability until February 10, 2021, at the earliest, so claims relating to the accommodation processes prior to that date fail as a matter of law. Second, after he did claim to be disabled, his employer engaged him in the interactive process in

United States District Court
Northern District of California

an attempt to find reasonable accommodations.

### 1.    The City Was Not Aware of Horton's Disability Until February 2021

"The ADA treats the failure to provide a reasonable accommodation as an act of discrimination if the employee is a 'qualified individual,' *the employer receives adequate notice*, and a reasonable accommodation is available that would not place an undue hardship on the operation of the employer's business." *Snapp v. United Transportation Union*, 889 F.3d 1088, 1095 (9th Cir. 2018) (internal quotations omitted) (emphasis added). "The Ninth Circuit has held that *notifying an employer of a need for an accommodation* triggers a duty to engage in an interactive process through which the employer and employee can come to understand the employee's abilities and limitations, the employer's needs for various positions, and a possible middle ground for accommodating the employee." *Id.* (internal quotations omitted) (emphasis added). California courts, applying federal ADA law to FEHA, have held that "[w]here the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer, . . . the initial burden rests primarily upon the employee . . . to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations." *Scotch v. Art Inst. of California*, 173 Cal. App. 4th 986, 1013 (2009) (quoting *Taylor v. Principal Fin. Grp.*, *Inc.*, 93 F.3d 155, 166 (5th Cir. 1996)).

The City's duty to engage in an interactive process and provide a reasonable accommodation for Horton's disability was triggered in February 2021, when Horton first informed his supervisors at the SFPUC that he had been diagnosed with PTSD in the aftermath of the August 12, 2020, attack. Horton argues that the City became aware of his disability as early as August 17, 2020, which is when he informed Mabutas of the attack. *See* TAC ¶¶ 77-78. But he is conflating his requests for safety accommodations with his requests for the SFPUC to reasonably accommodate his disability.

After Horton told Mabutas that he had been attacked, she informed the SFPUC Deputy General Manager, the Program Manager, Security Manager, and Health and Safety Managers, so that safety accommodations could be made. *See* Mabutas Decl. Exs. 5-6. Nothing in the record supports that when Mabutas (or anyone else from the City) was communicating with Horton about

the aftermath of the August 12, 2020, attack, the City had any reason to know that he was disabled. Indeed, Horton acknowledged that he did not understand himself to be suffering from PTSD until long after August 17, 2020. *See* Shapiro Decl. Ex. 13 (February 21, 2021, email from Horton to Mabutas seeking accommodation and stating in relevant part, "I didn't realize I was suffering from trauma until having time to process these events and take preliminary tests[.]").

### 2. After February 2021, the City Engaged in the Interactive Process; Horton Arguably Did Not

After the City became aware of Horton's disability, it engaged in the interactive process in an effort to provide a reasonable accommodation. "The interactive process requires (1) direct communication between the employer and employee to explore in good faith the possible accommodations; (2) consideration of the employee's request; and (3) offering an accommodation that is reasonable and effective." *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002). Importantly, the employer is not required to provide the exact accommodation that an employee requests, so long as they provide "some reasonable accommodation." *Id.*

Construing the facts in the light most favorable to Horton, the earliest that the City could have been aware of Horton's disability is February 10, 2021, which is when Horton sent his first worker's compensation request to Larcina and Mabutas. The DWC-1 form he attached indicates that after the attack in August 2020, he suffered "lower back, right hand pain, psychological trauma, nightmares, depression, anxiety, numbness, insomnia, blackouts." Shapiro Decl. Ex. 36. Although Horton had not yet explicitly declared that he was disabled, he did indicate that he was suffering from a number of symptoms that his employer could have interpreted as making his disability "open, obvious, and apparent". *See Scotch*, 173 Cal. App. 4th at 1013. Then, on February 22, 2021, Horton explicitly requested an ADA reasonable accommodation request form from Nelson and filed it that same day. *See* Shapiro Decl. Ex. 15.

Horton was on leave at the time. His employer regularly communicated with him about his options. Early on in the accommodation process, Horton asked to do his work "100% remote." *See* Shapiro Decl. Exs. 13-15. However, entirely remote work was not possible given his job description. *See* Mabutas Decl. ¶¶ 2-7 (explaining that Horton's job required some in-person

10

attendance).  Nelson and Narbaitz instead urged Horton to submit a note from his doctor

specifying what work restrictions he had so that they might determine what accommodations

could be made available to him.  *See* Shapiro Decl. Exs. 5, 16-17, 26, 28, 32, 35, 40, 42-43.

Nelson told Horton that the City would be able to evaluate him for other jobs if and when Horton

submitted medical documentation indicating what work restrictions he had beyond simply being

unable to return to work.  *See id.* Ex. 5 at 66:5-67:16, 68:1-70:6, 98:7-99:16; *see id.* Exs. 16

(medical note from 2016), 26 (email from Nelson to Horton explaining what medical information

he needed to evaluate Horton for other positions), 28 (email from Nelson to Horton explaining that

he "can't put [Horton] in a job search that might result in placing you in a job" when he was

placed "completely off work by [his] doctor"), 32 (email from Horton to Nelson following up on a

phone conversation between the two of them, indicating that Horton did not want to be

"pressured" to return to work), 35 (email from Narbaitz to Horton extending his leave of absence

from through August 18, 2021 to through September 29, 2021).

Despite the requests for more detailed information, Horton's medical notes continued to

offer no indication of what modified work Horton might have been able to do.  *See* Shapiro Decl.

Exs. 19, 21, 23, 25, 29, 30, 32, 34.  What Horton was seeking, functionally, was indefinite leave

from work.  The Ninth Circuit has held that "recovery time of unspecified duration may not be a

reasonable accommodation (primarily where the employee will not be able to return to his former

position and cannot state when and under what conditions he could return to work at all)." *Dark v.*

*Curry Cnty.*, 451 F.3d 1078, 1090 (9th Cir. 2006); *see also Samper v. Providence St. Vincent Med.*

*Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012) (holding that accommodation that exempts a plaintiff

from an essential function of his job is not reasonable).[5]  The City extended Horton's leave of

absence six times between when Horton first indicated he was disabled and his medical separation.

Under the circumstances, it was under no obligation to do more.

Horton's reluctance to work with the City to find a reasonable accommodation is another

_____

[5] The City points out that Horton could have potentially been granted *some* telework, but, as I
stated before, he never submitted medical documentation that would have allowed the City to
evaluate his capacities and make such an adjustment.  *See* Motion 25:13-26:2; *see* Shapiro Decl.
Exs. 19, 21, 23, 25, 29, 30, 32, 34.

1   problem he cannot overcome.  To move forward with a FEHA interactive process claim, Horton

2   must show that he "was willing to participate in an interactive process to determine whether a

3   reasonable accommodation could be made," and that defendants "failed to participate in a timely

4   good-faith interactive process." California Civil Jury Instructions ("CACI") No. 2546.  In a FEHA

5   failure-to-accommodate claim, an employer can prevail at summary judgment if it can show that it

6   "did everything in its power to find a reasonable accommodation, but the informal interactive

7   process broke down because the employee failed to engage in discussions in good faith." *Jensen v.*

8   *Wells Fargo Bank*, 85 Cal. App. 4th 245, 262–63 (2000).

9       With respect to Horton's ADA claim, damages are not available for failure to

10  accommodate claims "where the covered entity demonstrates good faith efforts, in consultation

11  with the person with the disability who has informed the covered entity that accommodation is

12  needed, to identify and make a reasonable accommodation[.]" 42 U.S.C. § 1981a(a)(3); *see also*

13  *Damian Raffele v. VCA, Inc.*, 2020 WL 5875029 (C.D. Cal. Jul. 15, 2020) (discussing good faith

14  defense against ADA reasonable accommodation claims). The City has shown that it made good

15  faith efforts to accommodate Horton, but he disrupted the interactive process.

16      *Steffes v. Stephan*, 144 F.3d 1070 (7th Cir. 1998) is on point.  There, the court noted that

17  the employee plaintiff had caused a breakdown in the interactive process by failing to attempt to

18  provide specifics and detail about her work restrictions or provide helpful information about the

19  work she could do with her disability.  The Seventh Circuit explained that the plaintiff's

20  contributions to the breakdown was partial justification for granting summary judgment for the

21  defendants. *See Steffes*, 144 F.3d at 1072-74.  Here, Horton submitted what was essentially the

22  same doctor's note several times in a row, each time stating that he was "unable to attend work

23  and carry out his regular job duties," or something very like that statement.  *See e.g.* Shapiro Decl.

24  Exs. 19, 21, 23, 30.  This was despite Nelson's repeated requests that Horton provide more

25  information about his restrictions so that Nelson could consider Horton for other jobs that might

26  accommodate his disability.  Horton never provided that information.[6]

27  _____

28  [6] Horton's interactions with Dena Narbaitz, where he accused her of misconduct when she asked
    him whether he could provide more medical documentation, also show that Horton caused the

1    For all the reasons stated above, Horton's ADA and FEHA failure to accommodate and

2    disability discrimination claims cannot prevail, and the City is entitled to summary judgment on

3    Claims 3, 5, 11, and 12.

4    **B.      Claim 4: ADA Disparate Treatment**

5    Horton's disparate treatment claim arises from what he claims was the mishandled

6    allocation of parking passes.  After he was attacked in August 2020, Horton asked Mabutas what

7    the SFPUC was doing to help ensure his safety coming to and from work.  *See* Oppo. Ex. 18;

8    Mabutas Decl. Exs. 5-6.  Mabutas explained that, among other things, she was working on getting

9    Horton access to a temporary parking spot and a parking pass to go with it.  Mabutas Decl. Ex. 5.

10   Horton thanked her for her response.  Mabutas Decl. Ex. 6.

11   Horton states that other employees were provided with parking passes, and he was not. He

12   contends that his disability was the motivating factor behind this disparity.  *See* TAC ¶¶s 88, 89.

13   But this is not a cognizable ADA claim because at the time that Horton requested the parking

14   passes, he was not known (either to himself or the City) to be disabled.  He was requesting *safety*

15   accommodations, not disability accommodations.  *See* discussion *supra* Section I(A)(1).

16   Accordingly, any dispute over whether and to what extent the City made parking passes available

17   to him in the aftermath of the August attack is immaterial.

18   Moreover, the record shows that the SFPUC attempted to provide Horton with a parking

19   pass.  Larcina testified that he offered Horton the parking pass, but Horton rejected it, saying "he

20   didn't want to drive into work."  Shapiro Decl. Ex. 4 at 37:4-21.  Horton admitted that he was

21   offered the parking pass and that he told "[his] employer" that he thought driving to work would

22   be an "enormous expense."  *See id*. Ex. 1 at 278:11-279:3, 292:25-293:5.  This was Horton's

23   prerogative, but it does not enable him to complain about disparate treatment because the SFPUC

24   provided parking passes to other employees.  For these reasons, the City is entitled to summary

25   judgment on Claim 4.

26

27   ─────────────────────

28   breakdown in the interactive process.  *See* Shapiro Decl. Exs. 35, 39, 41-42.

United States District Court
Northern District of California

## II.     HOSTILE WORK ENVIRONMENT UNDER TITLE VII

Horton's Title VII hostile work environment claim (Claim 1) fails for two independant reasons.   Horton did not file an administrative complaint with the EEOC or DFEH that asserted a hostile work environment or race discrimination or anything reasonably related to either claim. And nothing in the record supports that the City created or perpetuated a hostile work environment.

### A.     Failure to Exhaust Administrative Remedies

Horton's hostile work environment cause of action is predicated on his allegation that "[d]efendants subjected [him]," a Black man, to "unwelcome conduct by forcing him, as a term and condition of his employment, to endure unwanted racial epithets, harassment, physical violence . . . [and a] harmful working environment and re-traumatization."  TAC ¶ 67.  But his administrative complaint, filed in February 2022 after these incidents occurred, makes no mention of either the racially motivated epithets themselves or his employer's alleged failure to address them.

"Under Title VII, a plaintiff must exhaust her administrative remedies by filing a timely charge with the EEOC, or the appropriate state agency, thereby affording the agency an opportunity to investigate the charge." *B.K.B. v. Maui Police Dept.*, 276 F.3d 1091, 1099 (9th Cir. 2002) (citing 42 U.S.C. § 200e-5(b)). A plaintiff does not need to specifically raise an issue in an EEOC charge to have the issue considered exhausted if the issue is "like or reasonably related to" the administrative allegations. *See id.* "Incidents of discrimination not included in an EEOC charge may not be considered by a federal court unless the new claims are like or reasonably related to the allegations contained in the EEOC charge." *Shelley v. Geren*, 666 F.3d 599, 606 (9th Cir. 2012) (quoting *Green v. L.A. Cty. Superintendent of Schs.*, 883 F.2d 1472, 1476 (9th Cir. 1989)).  In determining whether issues are "reasonably related," the court considers "whether the original EEOC investigation would have encompassed the additional charges." *Id.* (holding that newly alleged incidents were "reasonably related" to the EEOC charge because the incidents were "part of the same course of conduct" investigated by the EEOC).

The only administrative complaint in the record was filed on February 4, 2022, after

Horton was medically separated.  In it, Horton alleges that he experienced disability discrimination and that he had been retaliated against for requesting a disability related accommodation.  *See* Shapiro Decl. Ex. 49 (EEOC Complaint filed February 4, 2022, alleging "discrimination" and "retaliation").  The EEOC complaint explained that the discrimination Horton experienced was related to what Horton perceived to be his employer's failure to engage in the interactive process about his accommodation requests.  *See id.* at p. 2.  It stated that the retaliation he experienced was related to his request for a disability accommodation.  *See id.*  The EEOC complaint does not assert racial harassment or a hostile work environment, nor does it contain allegations that are "reasonably related" to hostile work environment allegations. This is fatal to his Title VII claim.  It fails.[7]

## B.  The Merits

Even if Horton had administratively exhausted his Title VII claim, it fails on the merits. The claim conflates the harassment Horton endured at the hands of third parties with what he perceives to be harassment and discrimination that he endured at the hands of his employers.

Title VII is violated where the "workplace is permeated with 'discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (cleaned up).  In determining if an environment is so hostile as to violate Title VII, the court must consider whether, in light of "all the circumstances," the harassment is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1112–13 (9th Cir. 2004) (internal citations omitted).

An employer is not only liable for harassment or discrimination undertaken by itself or its employees; it may be held liable for "actionable third-party harassment of its employees," but only where the employer "ratifies or condones the conduct by failing to investigate and remedy it after

---

[7] Horton does not dispute that he never included allegations about race discrimination or harassment in his EEOC complaint, nor does he argue that the incidents of which he complained in the EEOC complaint were "reasonably related" to the epithet incidents.

United States District Court
Northern District of California

1   learning it." *Galdamez v. Potter*, 415 F.3d 1015, 1022 (9th Cir. 2005).  As to harassment by

2   persons who are not supervisors, plaintiff must show that "management knew or should have

3   known of the harassment and failed to take reasonably prompt, corrective action." *Swinton v.*

4   *Potomac Corp.*, 270 F.3d 794, 803 (9th Cir. 2001) (cleaned up).

5        Horton alleges that he was subjected to harassment by his supervisor Larcina and by the

6   facilities director, Mabutas, because of his race.  He does not allege that Larcina or Mabutas

7   themselves harassed him; rather, he contends that they "subjected" him to "unwelcome conduct"

8   by "forcing him . . . to endure unwanted racial epithets, harassment, physical violence … [a]

9   harmful working environment and re-traumatization." TAC ¶ 66.  The conduct he endured was

10  perpetrated by third parties who "called [Horton] the N-word" and "threat[end] 'murder the

11  monkey' in Spanish." *Id.* ¶ 68.  That Horton endured such foul language, especially within the

12  same year that he suffered a physical attack, is regrettable.  But the City's conduct was not.

13       Horton informed his employer about these continuing incidents of harassment for the first

14  time on February 21, 2021, when he submitted the second worker's compensation claim.  *See*

15  Shapiro Decl. Ex. 37.  His first claim did not indicate that he was being harassed at work.  *See*

16  Recino Decl. Ex. 2.  After Horton submitted the second one, the City extended his leave of

17  absence at least six times; Horton did not work in-person from the time he first went on family

18  medical leave in December 2020 until he was medically separated in November 2021.  *See*

19  Shapiro Decl. Exs. 20, 22, 24, 31, 33, 35.

20       Horton states in the TAC that "Mabutas and Larcina refused to take steps needed to

21  prevent or limit" his harassment, "despite having it being a known dangerous area, plaintiff filing

22  police reports, restraining orders with the DA, multiple incidents, complaints, and accommodation

23  requests to improve safety[.]" TAC ¶ 68.  Horton says that he found his work environment to be

24  "hostile and heavily charged with physical violence, threats and discrimination," and that the

25  defendants "did not exercise reasonable care to prevent the creation of a hostile work environment

26  charged with racial epithets, physical violence, disability discrimination and did not exercise

27  reasonable care to rescind current practices."  *Id.* ¶ 70.  But once he *did* alert his supervisors to the

28  hostilities that he faced from those third parties, and explained the trauma he was experiencing as

a result, they extended his leave of absence several times.

Horton argues that he reported these incidents to his supervisors when they happened but provides no evidence to back up his claim.  *See* Oppo. at p. 4-5.  He says that he filed "multiple internal complaints with the security officers"; that may be true, but those security officers were San Francisco Police Department sheriffs who do not report directly to Horton's supervisors. SFPUC policies state that incidents like these should be reported to a supervisor, which Horton did not do.  Declaration of Michael Ho ("Ho Decl.") [Dkt. No. 107-60] ¶¶ 5-8, Ex. 2 at CCSF_5177, Ex. 3 at CCSF_05100, Ex. 4, Ex. 5.[8]  While he may have expected the security guards to report the incidents of racial harassment by third parties to his supervisors, *see* Shapiro Decl. Ex. 1 (Horton Deposition) 291:1-15, that did not happen, and nothing in the record suggests it should have as a matter of policy.[9]

What Horton endured at the hands of third parties was unfortunate.  But there is nothing in the record that supports the elements of a Title VII claim for a hostile work environment.  The City and its employees did not harass Horton.  Once the City was made aware of the third-party harassment, Horton was on a leave of absence that the City extended multiple times.  For these reasons, defendants are entitled to summary judgment on Claim 1.

### III.   LABOR CODE SECTION 6311

Horton asserts a claim under California Labor Code section 6311, alleging that defendants retaliated against him for refusing to work in violation of health and safety standards (Claim 17). Section 6311 provides that "[n]o employee shall be laid off or discharged for refusing to perform

---

[8] Horton included in his Opposition two reports that he wrote about telephone conversations he had with San Francisco Police Department officers Wong and Dong about his experiences with racial harassment at the hands of third parties while at work.  *See* Oppo. Exs. 6-7; *see also* Plaintiff's Ex Parte Request for Assistance from Court [Dkt. No. 110].  These reports are hearsay and cannot be considered as evidence.  That said, nothing in those reports would change my analysis of any claims in this case.  Horton's ex parte motion regarding the officers is DENIED as moot.

[9] In the TAC, Horton also alleges that he was "informed from another supervisor and senior employees retiring that Black Americans were not being treated fairly, targeted and to be careful of termination while [sic] temporary status." *Id.* ¶ 68.  If he received such warnings, there is no evidence of them in the record.  And assuming the allegation is true, that has no bearing on whether the City was on notice of his complaint about a hostile work environment.  Nothing in the record supports that it was.

1    work . . . where [a workplace safety] violation would create a real and apparent hazard to the

2    employee or their fellow employees."  Cal. Lab. Code § 6311.  The undisputed facts show that the

3    City medically separated Horton because it could not reasonably provide the accommodation that

4    he sought for his disability, not because he refused to work in violation of health and safety

5    standards.

6         The letter of medical separation that the SFPUC sent to Horton on November 30, 2021,

7    explains that he had been on leave since December 4, 2020, with personal medical leave starting

8    on March 4, 2021.  *See* Shapiro Decl. Ex. 48 (Letter of Medical Separation, sent by Dennis J.

9    Herrera, General Manager, SFPUC).  The letter states that indefinite leave was not a reasonable

10    accommodation and that Horton had not provided any medical documentation suggesting he could

11    return to work by a certain date despite repeated requests for that information.  *Id.*  It also states

12    that Horton had failed to engage in the interactive process in good faith. *Id.*  Nothing in the letter

13    indicates that Horton was terminated because he expressed an unwillingness to work in a

14    dangerous workplace environment.

15         In addition, to prevail on a section 6311 claim Horton would have to show, among other

16    things, that there was a violation of a health and safety standard that "would create a real and

17    apparent hazard to the employee or their fellow employees." Cal. Lab. Code § 6311.  It is not

18    enough that Horton reasonably believed that his workplace, or the area immediately surrounding

19    it, was unsafe. *See Hentzel v. Singer*, 138 Cal. App. 3d 290, 299-300 (1982); *Frazier v. United*

20    *Parcel Serv., Inc*., 2005 WL 1335245, at *12 (E.D. Cal. May 3, 2005).  Because section 6311

21    "protects the more drastic conduct of refusing to work where some occupational safety or health

22    standard . . . will be violated," the statute requires a plaintiff to show that a real and apparent

23    hazard objectively existed.  *Hentzel*, 138 Cal. App. 3d at 299-300; *see also Frazier*, at *12.

24    Horton cannot show that.  Horton testified to "unsafe activities," and "homeless encampments"

25    around 525 Golden Gate, but nothing more acute than that.  I am familiar with this area, as our

26    courthouse is located at 450 Golden Gate Avenue.  Not only has Horton not alleged a plausible

27    section 6311 claim, there is no way that he could do so.  For all of these reasons, the City is

28    entitled to summary judgment on Claim 17.

United States District Court
Northern District of California

## IV.    TITLE VII, ADA, FEHA, AND LABOR CODE SEC. 1102.5 RETALIATION

For the same reasons that Horton's section 6311 claim fails, his retaliation claims brought under Title VII, the ADA, FEHA, and Cal. Labor Code § 1102.5 (Claims 2, 6, 13, and 15) also fail.  The undisputed evidence shows that Horton was medically separated after the SFPUC extended his leave of absence six times because no reasonable accommodation could be found. *See* discussion *supra* Sections I, III.  Nothing in the record supports that Horton was terminated for a retaliatory reason.

The *McDonnell-Douglas* burden shifting framework applies to retaliation claims under Title VII, ADA, and FEHA. *See Yartzoff v. Thomas*, 809 F.2d 1371, 1375 (9th Cir. 1987) (Title VII), *Kelly v. Boeing Co.*, 400 F. Supp. 3d 1093, 1107 (D. Or. 2019) (ADA); *Ruiz v. RSCR California, Inc.*, 683 F. Supp. 3d 1079, 1099 (C.D. Cal. 2023) (FEHA).  Once the plaintiff establishes a prima facie case of retaliation, the burden then shifts to the defendant to provide a legitimate, non-discriminatory reason for its decisions.  *See Yartzoff*, 809 F.2d at 1376.  Then the burden shifts back to the plaintiff to show why that reason is pretextual.[10]

First, it is questionable whether Horton could establish a prima facie case.  He requested reasonable accommodation and accused Mabutas of discriminating against him in February 2021. *See* Mabutas Decl. Ex. 8; Shapiro Decl. Ex. 15.  He later accused Nelson of misconduct in May 2021. Shapiro Decl. Ex. 25.  He was not terminated until November 30, 2021.  In the intervening time, after he had engaged in protected activity but before he was medically separated, his leave of absence (first issued in response to his disability accommodation request) was issued and extended six times.  Too many intervening factors separate his protected activity (requesting reasonable accommodation and later accusing Mabutas of discrimination) from the allegedly retaliatory action (medical separation).

But if the burden shifts, the City has shown that it had legitimate nondiscriminatory

---

[10] In the section 1102.5 context, the plaintiff must show that retaliation was a "contributing factor" to the termination.  *See Lawson v. PPG Architectural Finishes, Inc.*, 12 Cal. 5th 703, 718 (2022). At that point, the burden shifts to the employer to show by "clear and convincing evidence," that it would have terminated the plaintiff for a legitimate, unrelated reason even if the plaintiff had not engaged in the protected activity in question. *See id.*

United States District Court
Northern District of California

reasons for terminating Horton—reasons that Horton cannot meaningfully contest as pretextual. *See* discussion *supra* Sections I, III.  The SFPUC attempted to engage Horton in the interactive process over the course of seven months, and during that time, Horton provided no medical information illuminating how he could return to work even in a diminished capacity.  *See* discussion *supra* Section I(A)(2).  The only accommodation to which he appeared amenable was "100% telework," which was incompatible with his job description. *See id.*; *see also* Section III.  Horton has provided no rebuttal to the City's reasoning and has not shown why it was a pretext for retaliation.

For these reasons, the City is entitled to summary judgment on Claims 2, 6, 13, and 15.

## V.    FAILURE TO PREVENT HARASSMENT AND DISCRIMINATION

Claim 14 asserts failure to prevent discrimination and harassment in violation of FEHA. Failure to prevent under FEHA requires predicate claims of discrimination and harassment. Horton's predicate claims fail.  *See supra* Section II.  Accordingly, Claim 14 also fails.

## VI.    *SKELLY* CLAIM

Horton also asserts a claim for violations of *Skelly* procedures (Claim 9).[11]  A due process claim under Article I, Section 7 of the California Constitution requires: (1) the deprivation of a protected property or liberty interest, and (2) the denial of adequate procedural protections. *See Skelly v. State Personnel Bd*, 15 Cal.3d 194, 206, 208 (1975) (considering whether the discharged employee had a property interest in his employment and whether the discharged employee received adequate procedural safeguards).

To prevail on a *Skelly* claim, Horton must first show that he was deprived of a protected property interest.  To show that he had a property interest in his employment, he must establish that he was a permanent employee rather than a probationary employee. "The California civil service employment scheme confers upon permanent employees 'a property interest in the

---

[11] "*Skelly* procedures" refers to the case *Skelly v. State Personnel Bd*., 15 Cal. 3d 194 (1975). There, the California Supreme Court held that an employer cannot take away a permanent public employee's property rights (i.e., their vested right to continued employment) without following certain procedural safeguards. *See id*. at 215.

continuation of [their] employment which is protected by due process.'" *Roe v. State Personnel Bd.*, 120 Cal. App. 4th 1029, 1040 (2004) (quoting *Skelly*, 15 Cal. 3d at 206). But non-permanent employees "serve at the will of the employer and therefore do not possess any property interest in their continued employment." *Mendoza v. Regents of University of California*, 78 Cal. App. 3d 168, 173 (1978); *accord Walls v. Central Contra Costa County Transit Authority*, 653 F.3d 963, 968 (9th Cir. 2011) (stating that non-permanent employees in California can be terminated at any time subject only to the limits of public policy).

Horton was a non-permanent employee when he was terminated. In pertinent part, the Notice and Report of Probationary Status ("Notice") that he signed states:

> Part I: Notice of Probationary Status and Time of Appointment
> *Complete at time of appointment*
>
> Congratulations on your Permanent Civil Service (PCS) appointment!
>
> You are now serving your probationary period, which is used to evaluate your performance on the job. It is the final and most important phase of the selection process. During your probationary period, you may be released by your appointing officer at any time in accordance with Civil Service Rule 117 – Probationary Period. The duration of your probationary period is governed by provisions in the Memorandum of Understanding (MOU) or ordinance covering your job code. Extensions of your probationary period are governed by Civil Service Rules and provisions in the MOU or ordinance covering your job code. . . .
>
> Duration of the Probationary Period (per MOU or Ordinance): 2080 hours.
>
> Did the employee received (sic) credit for prior service?: No.
>
> Probationary Period Begin Date: 12/12/2020
> Expected Probationary Period End Date: 12/11/2020
> *(Probation begins on the employee's start work date in PCS status, not the certification date)*

*See* Oppo. Ex. 1 (emphasis in original). Horton and his department head signed it on December 14, 2020, when he was already on FMLA leave.[12]

---

[12] Horton pointed out that the Notice submitted by the City with its motion for summary judgment was modified; he provided a copy of what he originally received. The City had annotated the

Horton argues that the Notice, signed on December 14, 2020, establishes that he had completed his probationary period as of December 11, 2020, three days earlier, and so he had a protected property interest when he was terminated. But that date is quite clearly a typographical error. The purpose of the Notice is to describe Horton's new work status, which requires a probationary period, and to explain how the probationary period works. He received the notice at the time of his appointment. Given that his probationary period was just starting, that he received no credit for prior service, and that he needed to work 2080 hours (40 [hours] multiplied by 52 [weeks]) in order to complete his probationary period, it is obvious that the expected end date of his probationary period should have read 12/11/2021, not 12/11/2020.

Horton contends that he started work in November 2019 and never agreed to extend his probationary period. Until December 12, 2020, however, he did not have a Permanent Civil Service appointment and had not accrued any hours towards completion of the probationary period. He received no credit for prior service as a stationary engineer. *See* Gardunio Decl. ¶¶ 2-4. He claims to have been a "permanent public employee who [sic] performed satisfactorily and moved into the permanent position as indicated on the documents and confirmed via the MOU," Oppo. at p. 6, but that is demonstrably untrue. He states that he "successfully served his probationary period . . . from 11/5/19 to 12/5/20 and was a permanent employee," *id.*; the Probationary Notice directly contradicts that. He was never a permanent employee. As a result, he had no right to a *Skelly* hearing. Summary judgment for the defendants is appropriate on Claim 9.[13]

---

original on April 25, 2024, to also include "12/11/2021" in large type as the expected probationary period end date, because the original Probationary Notice contained a typographical error. Defendant's Reply Brief ("Reply") [Dkt. No. 114] 3, n.1. I address the underlying issue in this section. I will strike the City's annotated version of the Notice and rely on Horton's unmodified version.

[13] Even if Horton were a permanent employee, his only argument in favor of the *Skelly* hearing's deficiencies is that Narbaitz was a non-neutral officer. With the benefit of a full record, I agree with the City that her presence did not so pollute the hearing as to render it ineffectual. Moreover, the City is correct that courts in this district have held that employees waive their right to challenge deficiencies in pre-deprivation hearings (like *Skelly* hearings) when they do not invoke their right to a post-termination hearing. *See Zografos v. City and County of San Francisco*, No. C 05-3881 PJHm 2006 WL 3699552, at *13 (N.D. Cal. Dec. 13, 2006). Under the relevant rules governing City employees, permanent employees have that right; Horton did not invoke it. Even

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**CONCLUSION**

For the foregoing reasons, the defendants are entitled to summary judgment on all claims. The clerk of the court shall enter judgment in the defendants' favor and close the case.

**IT IS SO ORDERED.**

Dated: November 7, 2024



William H. Orrick
United States District Judge

---

assuming, arguendo, that he was a permanent employee (which he was not), he waived his right to assert a *Skelly* claim when he did not request a post-termination hearing.